Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/28/2020 09:09 AM CDT

State of Nebraska on behalf of Ryley G., a minor
child, appellee, v. Ryan G., defendant and
third-party plaintiff, appellant,
and Rashell K., third-party
defendant, appellee.

___ N.W.2d ___

Filed June 5, 2020.    No. S-19-892.

1. **Paternity: Appeal and Error.** In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Evidence: Appeal and Error.** In a de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

5. **Child Custody: Visitation.** The purpose of requiring a legitimate reason for leaving the state in a motion to remove a minor child to another jurisdiction is to prevent the custodial parent from relocating the child because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights.

6. **Child Custody.** In considering a motion to remove a minor child to another jurisdiction, the paramount consideration is whether the proposed move is in the best interests of the child.

7. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation.

8. **Parental Rights: Child Custody.** The custodial parent has the right to travel between states and the right to migrate, resettle, find a new job, and start a new life.

9. **Child Custody.** An award of custody to a parent should not be interpreted as a sentence to immobility.

10. ____. Career advancement of a new spouse is a legitimate reason to remove a child to another jurisdiction.

11. ____. The desire to form a new family unit through remarriage is a legitimate reason to remove a child to another jurisdiction.

12. **Judgments: Final Orders.** If a judgment looks to the future in an attempt to judge the unknown, it is a conditional judgment. A conditional judgment is wholly void because it does not "perform in praesenti" and leaves to speculation and conjecture what its final effect may be.

13. **Child Custody.** The standard for approval of a motion to remove a child to another jurisdiction applies both when a custodial parent seeks to move a child from Nebraska to a different state and in considering a subsequent move to yet another state.

14. **Courts: Child Custody: Visitation.** The authority to determine custody and visitation cannot be delegated, because it is a judicial function.

15. **Modification of Decree: Child Custody.** A court cannot delegate to a custodial parent, who has obtained permission only for removal of a child from Nebraska to one state, the authority to move the child to yet another state without permission.

16. ____: ____. Removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody. Nevertheless, such a move, when considered in conjunction with other evidence, may result in a change of circumstances that would warrant a modification of the decree.

Appeal from the District Court for Lancaster County: ROBERT R. OTTE, Judge. Affirmed as modified.

David V. Chipman, of Monzón, Guerra & Associates, for appellant.

Linsey A. Camplin, of McHenry, Haszard, Roth, Hupp, Burkholder & Blomenberg, P.C., L.L.O., for appellee Rashell K.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## INTRODUCTION

A noncustodial parent appeals from a modification of a filiation judgment granting the custodial parent "leave to remove the minor child from the State of Nebraska and to determine his primary place of residence" without specifying where the child could be moved or placing any limitation on further moves. Two questions predominate.

First, did a deployment of the custodial parent's new military spouse for 1 year to a base near Washington, D.C., coupled with a change in employment conditions after the deployment ended, constitute a legitimate reason for leaving the state? It did. Second, did the district court's open-ended permission violate the standard for approval and, thus, amount to an improper delegation of judicial authority? It did.

Because the court did not otherwise abuse its discretion, we affirm the order below as modified to limit the permission to move the child only to the military base near Washington, D.C.

## BACKGROUND

### Prior Proceedings

Rashell K. and Ryan G. are the natural parents of Ryley G., born in 2007. In 2009, the State initiated a filiation proceeding, which resulted in a support judgment against Ryan. At that time, neither Rashell nor Ryan sought any orders regarding child custody. In 2015, Ryan sought a modification, which in June 2016 resulted in an order and formal parenting

plan awarding Rashell legal and physical care, custody, and control of Ryley, subject to Ryan's parenting time. It consisted of every other Friday from 7:30 p.m. to 7:30 p.m. on Sunday and all but 3 weeks of each summer vacation from school.

## Modification Sought

In November 2018, Rashell sought a modification of the judgment, asserting that she had married and had a newborn child; that her husband was active in the National Guard and was scheduled to be deployed to the District of Columbia in mid-2019; that he would likely be stationed outside of Nebraska following the deployment; and that it was in Ryley's best interests to permit removal from Nebraska. She specifically requested permission "to move with the minor child to the District of Columbia, and thereafter to where her husband is stationed" and sought other related relief.

Ryan filed an answer opposing the removal and a "counter-complaint" seeking a change of custody and other associated relief. The matter proceeded to trial.

## Evidence at Trial

At trial, the parties avoided Ryley's participation by stipulating that Ryley would testify he had a good relationship with his father, he had a stronger bond with his mother, and he wanted to remain living with his mother. The district court heard testimony from three witnesses: Ryan, Rashell, and Rashell's husband, Joshua Chubb.

Chubb testified that he was a Blackhawk helicopter instructor pilot for the Missouri National Guard. He had been working 40 to 42 hours per week, compressed into 3 days each week, and had been commuting from Lincoln, Nebraska, to Whiteman Air Force Base in Missouri for his employment.

Chubb stated that he had been called to active duty and ordered to report for processing in North Carolina, where he expected to be ordered to report to Fort Belvoir in Washington, D.C., for 1 year. Although the parties at times characterized

Fort Belvoir as being located in the District of Columbia, they also described it as situated in Virginia, near Washington, D.C.

Chubb testified that while at Fort Belvoir, his family would have on-base housing. The house would have three bedrooms and would be located in a low-crime area within one-half mile from the school that Ryley could attend. Chubb would receive a housing allowance, and Rashell would not need to work outside of the home.

After completion of this deployment, Chubb testified, he would be ordered to return to Missouri for demobilization. Thereafter, he explained, there were only two places in the country where he would be able to work as a Blackhawk helicopter instructor pilot: Missouri or Alabama. He anticipated moving to Alabama for an instructor position in a nondeployable unit. If he received that position, he would work shorter days and be paid more.

Chubb did not expect to return to Lincoln. He testified that if he returned to Missouri, the chances were "slim to none" that he could resume the same schedule he had while commuting from Lincoln. Instead, he would not be allowed to have Fridays off. He would have to work Tuesday through Friday, with only Saturday, Sunday, and Monday off. He explained that he would not have the same flexibility and schedule as before, because he would become a "legitimate full-time employee working there." So at that point, his family would reside with him in Missouri as opposed to his living in Lincoln and commuting. Moreover, there was no opportunity as a Blackhawk instructor closer to Lincoln than Whiteman Air Force Base.

Rashell stated that her intention was to move to Fort Belvoir for 1 year and then move to wherever Chubb found a job. She did not have an address for their home in Fort Belvoir. She was a registered nurse, and she explained that in order to receive a nursing license in Virginia, she would need a specific home address. She stated that if she could find a flexible, part-time nursing job, she would work; otherwise, she would stay at home with her children.

Rashell explained that at Fort Belvoir, the elementary school consists of "K" to sixth grade. Ryley would be entering sixth grade. By the end of the trial, she testified regarding the base's recreational amenities and sports programs.

Ryley's community and extended family were in Lincoln. Rashell's and Ryan's families were also there. And so were Ryley's friends and school classmates. Ryley had participated in several sports teams in Lincoln.

Ryan actively participated in Ryley's life. Ryan exercised all of his parenting time. Rashell allowed Ryan to take Ryley to and from school on snowy or rainy days. Ryan attended the majority of Ryley's sports games. Ryan had made plans that if he was awarded physical custody, family members would care for Ryley when Ryan had to work late or on weekends.

Rashell had made all of Ryley's doctor appointments and taken care of his medical needs. Ryley takes asthma shots every other week, and in a previous summer, Ryan had forgotten to take Ryley to receive his shots. Ryan had never met Ryley's primary care doctor or his dentist.

Rashell explained that she did not yet have any information regarding who would be Ryley's primary care physician or dentist or where he would receive his asthma shots at Fort Belvoir. This, she said, was because their "insurance [was] through Tri-Care, [which was] divided into an east and a west and [they were] currently in the west." This meant, she testified, that they could not "move it to the east until [they] actually move there."

According to Rashell, if Ryley was not allowed to move with her, it would have a negative effect on Ryley. She based this upon her observations of Ryley after he returned from Ryan's house. On such occasions, she testified, Ryley was withdrawn and worried as to how she would react to small things. Rashell calculated that if Ryley moved with her, Ryan would lose 40 days of overnight parenting time. However, according to Rashell, if Ryley stayed with Ryan, she would lose 180 days of overnight parenting time.

### DISTRICT COURT'S ORDERS

The district court first entered an interlocutory order addressing the custody and removal issues and reserving the support and related matters. The court later entered a final order, incorporating a copy of the first order and disposing of the remaining issues.

In the first order, the court found that Rashell met the threshold requirement of proving a legitimate reason for moving. It explained that she had a desire to establish a family unit with her new husband, her new child, and Ryley. It stated that Chubb would see an income increase and "secure his position with a solid upside." This, the court found, was a legitimate reason for the move.

After clearing the threshold requirement, the court then considered the best interests factors, addressing (1) the parents' motives for seeking or opposing the move, (2) the potential the move holds for enhancing the quality of life for the child and custodial parent, and (3) the impact the move will have on contact between the child and the noncustodial parent.

Regarding the parents' motives, the court determined that both parents had valid reasons for and against removal and that this factor did not weigh for or against removal.

The court then considered nine elements of the quality-of-life factor. The court's order discussed each element.

First, it assessed Ryley's emotional, physical, and developmental needs. Concluding that this factor disfavored the move, the court explained:

> The . . . minor child is thriving in Nebraska and his needs are being met. He spends a lot of time with his father and . . . they have a good relationship. . . . A move would take Ryley away from extended family and friends at a time that is significant in his development.
>
> Rashell has a substantial number of her family members in Lincoln. Ryan also has family members in Lincoln. A move would take Ryley away from these family members.

Ryley has a number of interests including music, lacrosse, baseball, basketball, and flag football. Ryan attends Ryley's activities. Rashell had done little at the time of trial, if anything, to investigate any of those activities if the move were allowed. There is little doubt Ryan is actively involved in Ryley's life and willing to take on the custodial role here.

Second, it stated that Ryley's preference to stay with Rashell favored the move. The court noted that "[w]hile Ryan suggests this factor should be neutral, he should not be surprised that the court finds [Ryley's preference] is important to the determination here."

Third, the court considered the extent to which the custodial parent's income or employment would be enhanced. It observed that although the move was not based on Rashell's career, the family considerations were no less important. Because of Chubb's career, Rashell would be allowed to stay home and care for the children. Although her future prospects were not clear and it did not appear that her employment opportunities were enhanced, Chubb was "on a career path that overall will be favorable in the long-run to the family." It concluded that this was a neutral factor.

Fourth, addressing housing or living conditions, the court reasoned that because Rashell eventually presented evidence that the housing options on the military base would be suitable and that Ryley's education needs could be met, the factor was generally neutral or slightly negative.

Fifth, regarding educational advantages, the court determined that Ryley's educational needs were being met and that Rashell had provided "only scant" evidence of any advantages from the move. This factor, the court concluded, "slightly disfavor[ed]" the move.

Sixth, the court discussed the quality of the relationships between the child and each parent, which, the court found, favored the move. Although the relationships with each parent were strong and Ryan had been very active in Ryley's life, Rashell had "provided most of the support for education,

medical needs, and for extracurricular activities . . . , and ha[d] been the parent most focused on [Ryley's] essential well-being and care." The court concluded that Rashell's "parenting time pretty substantially outweigh[ed] that of Ryan and her day-to-day life show[ed] the overall attentiveness to [Ryley's] needs emotionally, spiritually, educationally, and socially."

Seventh, it discussed the strength of the child's ties to the community and extended family. It explained that Ryley was "fully ingrained" in Lincoln and had significant ties that would be diminished or lost with the move. This factor, the court determined, disfavored the move.

Eighth, in discussing the likelihood that allowing or denying the move would antagonize hostilities between the parents, the court noted that the parties refrained from being "deeply critical" and showed a level of maturity and understanding. It explained that Rashell offered several concessions to Ryan's parenting time that would be "difficult to execute, but not so impossible as to prevent the move." It found that the parties were "very focused" on Ryley's best interests and that Rashell's commitment to Ryan's parenting time was credible. According to the court, this factor slightly favored the move.

Addressing the last element of the quality-of-life factor, the court determined that the living conditions and employment opportunities of the custodial parent slightly favored the move. Here, the court found that the best interests were "interwoven with the well-being of the custodial parent." Rashell had, the court observed, provided most of Ryley's care and support. Chubb would "support Rashell being a stay-at-home mother" and would make a sufficient income. It reasoned that "[t]he fact that Rashell would be home parenting is at least as positive as having her base the move on improving employment opportunities in a new environment."

Turning to the third best interests factor, the court reasoned that it "must make some pretty aggressive assumptions to believe that moving the minor child would not have a significant negative impact on the parenting time of Ryan. Rashell,

to her credit, has offered substantial parenting time." But the court also recognized that "a reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason."

Ultimately, the court found that "the reasons for Rashell's move, the weight of Ryley's preference, and the opportunities that are provided for Rashell and Ryley in the long-run, satisfy the burdens placed on Rashell to establish a good reason for the move and that the move is in the best interests of Ryley." Accordingly, the court stated, Rashell's "request to move Ryley is approved. Ryan's Cross-Petition is dismissed." The first order, the court stated, was not final, because there were unresolved issues of parenting time and child support. It specified procedures for adjudicating the remaining issues.

One month later, the court entered a final order. This order "granted [Rashell] leave to remove the minor child from the State of Nebraska and to determine his primary place of residence." It did not specify the location of the move or place any restriction on further moves.

Ryan filed a timely appeal, which we moved to our docket.[1]

## ASSIGNMENTS OF ERROR

Ryan assigns that the district court erred in (1) finding that Rashell demonstrated a legitimate reason for leaving Nebraska with Ryley; (2) finding that it was in Ryley's best interests to relocate to Washington, D.C.; (3) granting Rashell the "open-ended right" to relocate outside of Nebraska to Washington, D.C., and then to Chubb's next job regardless of where it is located; and (4) "not finding a material change of circumstance that the best interests of [Ryley] required custody to be placed with [Ryan]."

## STANDARD OF REVIEW

[1,2] In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2018).

record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion.[2] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[3]

[3] In a de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[4]

## ANALYSIS

We have said that parental relocation issues are among the most difficult that courts face.[5] That is true here. For this reason, such determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given deference.[6]

### Framework for Removal Decisions

[4,5] Before we address Ryan's specific arguments, we first recall the legal framework governing the removal of a minor child to another jurisdiction. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state.[7] After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.[8] The

---

[2] *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

[3] *Id.*

[4] *Id.*

[5] See, e.g., *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

[6] *Steffy v. Steffy, supra* note 5.

[7] *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014).

[8] *Id*.

purpose of requiring a legitimate reason for leaving the state in a motion to remove a minor child to another jurisdiction is to prevent the custodial parent from relocating the child because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights.[9]

[6,7] In considering a motion to remove a minor child to another jurisdiction, the paramount consideration is whether the proposed move is in the best interests of the child.[10] In determining whether removal to another jurisdiction is in the child's best interests, the trial court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation.[11]

[8] Fundamental constitutional rights underlie this framework. The custodial parent has the right to travel between states and the right to migrate, resettle, find a new job, and start a new life.[12] Both parents, custodial and noncustodial, have the constitutional right to the care, custody, and control of their children.[13]

Ryan does not assert that the district court employed the wrong framework. Instead, he quarrels with its application to the facts of this case.

## Legitimate Reason for Removal

Ryan first argues that the district court erred in finding that Rashell had a legitimate reason for moving to another

---

[9] *Steffy v. Steffy, supra* note 5.

[10] *Id.*

[11] *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

[12] *Shapiro v. Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), *overruled on other grounds, Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).

[13] *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

jurisdiction. He contends that we have never "found that a parent's desire to relocate to a spouse's temporary job relocation is a legitimate reason to relocate with the minor child."[14]

[9-11] We have long held that an award of custody to a parent should not be interpreted as a sentence to immobility.[15] Thus, we have held that career advancement of a new spouse is a legitimate reason to remove a child to another jurisdiction.[16] Another legitimate reason is the desire to form a new family unit through remarriage.[17] Both reasons factor into the situation here.

We disagree with Ryan's characterization of Rashell's reason for moving as a temporary job relocation. Chubb, a member of the Missouri National Guard, was called to active service in the U.S. Army and deployed to a base near Washington, D.C. This activation and deployment is mandatory and not in any sense voluntary. It is true that this aspect of his job will end after 1 year. But many job opportunities involve a risk of transfer after only a short period. And at the end of the 1-year deployment, he clearly intends to continue his military career as a Blackhawk helicopter pilot.

---

[14] Brief for appellant at 18 (emphasis omitted).

[15] See, *Daniels v. Maldonado-Morin, supra* note 7; *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994); *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989); *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986); *Vanderzee v. Vanderzee*, 221 Neb. 738, 380 N.W.2d 310 (1986); *Boll v. Boll*, 219 Neb. 486, 363 N.W.2d 542 (1985); *Gotschall v. Gotschall*, 210 Neb. 679, 316 N.W.2d 610 (1982).

[16] See, *McLaughlin v. McLaughlin, supra* note 11; *Vogel v. Vogel, supra* note 15; *Harder v. Harder, supra* note 15; *Demerath v. Demerath, supra* note 15.

[17] See, *Daniels v. Maldonado-Morin, supra* note 7; *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Harder v. Harder, supra* note 15; *Gerber v. Gerber*, 225 Neb. 611, 407 N.W.2d 497 (1987); *Maack v. Maack*, 223 Neb. 342, 389 N.W.2d 318 (1986).

While Chubb's immediate job placement is time limited, the job- and matrimonial-related reasons for removal are permanent. He has a career plan based upon military service. Rashell desires to join him in this military life. He knows that he will return to Missouri for demobilization. But there, the chances are "slim to none" that he could return to the schedule which made commuting from Lincoln possible. We cannot say that the desire to live a normal life with his family near the location of his job is illegitimate. Likewise, Rashell's desire to live with her new spouse at that job location is a legitimate reason for removal of the child from Nebraska.

## Best Interests

Under the framework set forth above, Rashell had the burden to show that it was in the child's best interests to continue living with her.[18] As we have already noted, Ryan quarrels only with the weight accorded by the court to the evidence bearing on the factors prescribed by that framework.

Ryan emphasizes the "temporary nature of the relocation."[19] But as we have already explained, the relocation is permanent in the sense that the family will not be returning to Lincoln.

Above, we set forth the district court's analysis in considerable detail. Here, the deference we accord to the court's factual findings becomes important. We find no abuse of discretion in the court's best interests analysis.

## Removal Beyond Washington, D.C.

Ryan argues that the district court erred in granting an "open-ended" right to relocate the minor child first to Washington, D.C., and then to Chubb's next job location.[20] To support this argument, he tenders two rationales. One lacks merit but the other is valid.

---

[18] *Daniels v. Maldonado-Morin, supra* note 7.

[19] Brief for appellant at 24.

[20] Brief for appellant at 26.

In one rationale, Ryan challenges the district court's order as a void conditional order, "to the extent" the court "granted Rashell permission to relocate to wherever [Chubb] finds another job."[21] In making this argument, he relies upon our decision in *Vogel v. Vogel*.[22]

[12] There, we relied on two related propositions. If a judgment looks to the future in an attempt to judge the unknown, it is a conditional judgment. A conditional judgment is wholly void because it does not "perform in praesenti" and leaves to speculation and conjecture what its final effect may be.[23] Applying those principles, we vacated provisions of a removal order which (1) imposed a new schedule for physical possession of the children "in the event [the mother's spouse] is transferred overseas and [the mother] elects to join him" and (2) dictated a new visitation schedule "in the event [the mother and the father] establish residences within 50 miles of one another."[24] In both instances, the *Vogel* orders were to become effective only upon the happening of certain future events which might or might not occur. Whether the orders would ever have become effective was speculative.

Here, however, the district court's final order did not include similar language. Instead, this order simply stated that Rashell was "granted leave to remove the minor child from the State of Nebraska and to determine his primary place of residence." It did not, as Ryan contends, state any location to which such permission extended. To the extent that the court's first order can be read to incorporate Rashell's prayer into its relief, the final order expressly states that it "shall supersede and control." The final order may have been carefully crafted to avoid the use of conditional language. But in avoiding that pitfall, it ran afoul of another principle.

---

[21] *Id.* at 27.

[22] *Vogel v. Vogel, supra* note 15.

[23] *Id.*

[24] *Id*. at 1038-39, 637 N.W.2d at 619.

[13] In the other rationale, Ryan argues that the district court's order violated a standard articulated by the Nebraska Court of Appeals in *Maranville v. Dworak*.[25] There, after obtaining the trial court's permission to move the children to Illinois, followed by an unsuccessful appeal by the noncustodial parent, the custodial parent sought further permission to move the children to Ohio, based upon her spouse's job change. The trial court granted that permission. On appeal, the Court of Appeals determined that the standard for approval of a motion to remove a child to another jurisdiction applies both when a custodial parent seeks to move a child from Nebraska to a different state and in considering a subsequent move to yet another state.[26]

[14,15] Although the Court of Appeals did not say so, we believe that this standard derives from a more fundamental principle: The authority to determine custody and visitation cannot be delegated, because it is a judicial function.[27] And we restate that principle in the specific context of a parental relocation: A court cannot delegate to a custodial parent, who has obtained permission only for removal of a child from Nebraska to one state, the authority to move the child to yet another state without permission. Here, because the authority to determine custody and visitation is a judicial function, it cannot be delegated to Rashell.

Rashell responds that the district court's order expressly gave her permission to "relocate with Ryley to Fort Belvoir, and also subsequently to relocate in accordance with known

---

[25] *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008).

[26] *Id.*

[27] See, *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019); *Ensrud v. Ensrud*, 230 Neb. 720, 433 N.W.2d 192 (1988), *disapproved on other grounds, State on behalf of Kaaden S. v. Jeffery T., supra* note 2; *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002); *Lautenschlager v. Lautenschlager*, 201 Neb. 741, 272 N.W.2d 40 (1978).

employment opportunities to either Whiteman Air Force Base, Missouri, or Fort Rucker, Alabama."[28] But one has only to read the order to see that this is not so.

The order below does not undertake comparisons to Missouri or Alabama or make any findings regarding those locations' advantages or disadvantages in the best interests framework. Of course, we recognize that a court cannot make bricks without straw. Rashell failed to present evidence regarding those locations. Her evidence focused on Fort Belvoir. That limited the information available to the district court.

Even if she had furnished detailed information on both locations in Missouri and Alabama, her strategy would have failed. The court below could not have crafted an order permitting a move to the location of Rashell's or Chubb's choice without either employing a void conditional order or improperly delegating judicial authority.

The court's order supported the move to Fort Belvoir, but nothing more. We modify the order to make it clear that the permission granted to remove Ryley from the State of Nebraska extends only to move him to Fort Belvoir, in the State of Virginia, near Washington, D.C.

### DENIAL OF RYAN'S REQUEST FOR CUSTODY

Finally, Ryan argues that the district court erred in not finding a material change of circumstance such that Ryley's best interests required custody to be placed with him. This assignment lacks merit.

As Ryan's argument makes clear, it is founded upon his contention that the court erred in granting permission for Rashell to relocate Ryley to Fort Belvoir. He relies upon our decision in *Tremain v. Tremain*.[29] There, the trial court denied permission to move the child, but changed custody without determining whether the custodial parent would relocate to Nebraska

---

[28] Brief for appellee at 26.

[29] *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002).

in order to retain custody of the children. On appeal, we reversed the order changing custody and remanded the cause for further proceedings to ascertain whether the custodial parent would relocate.

[16] But here, we have determined that the district court properly granted Rashell permission to move with Ryley to Fort Belvoir. Thus, the premise underlying Ryan's argument failed. Removal of a child from the state, without more, does not amount to a change of circumstances warranting a change of custody. Nevertheless, such a move, when considered in conjunction with other evidence, may result in a change of circumstances that would warrant a modification of the decree.[30] Here, there is no other evidence that would warrant a modification of the judgment.

## CONCLUSION

Rashell established a legitimate reason for leaving Nebraska and moving with Ryley to Fort Belvoir. The district court did not abuse its discretion in determining that it was in Ryley's best interests to continue living with her. Similarly, the court did not abuse its discretion in declining to change custody of Ryley from Rashell to Ryan. To the extent that the court's order can be read to authorize Rashell to move later with Ryley to either Missouri or Alabama, we modify the order to eliminate that authority. Permission for any further move must be sought in a new proceeding. The permission granted in the proceeding before us permits Rashell to move with Ryley only to Fort Belvoir, in the State of Virginia, near Washington, D.C. As so modified, we affirm the order of the district court.

AFFIRMED AS MODIFIED.

---

[30] *Vogel v. Vogel, supra* note 15.