IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


WORKMAN V. WORKMAN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


GARY W. WORKMAN, APPELLEE,

V.

KIRA D. WORKMAN, NOW KNOWN AS KIRA D. ATHEN, APPELLANT.


Filed August 5, 2025.    No. A-24-958.


Appeal from the District Court for Hall County: JOHN H. MARSH, Judge. Affirmed.

Charles R. Maser, of Maser Law Office, for appellant.

Galen E. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellee.


RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Kira D. Workman, now known as Kira D. Athen, appeals from the Hall County District Court's order in favor of Gary Workman denying her motion to remove the parties' minor child from Nebraska to Idaho. Kira argues that the district court erred in finding that removal was not in the minor child's best interests. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Gary and Kira were married in 2010 and had one child during the marriage: Braylee Workman, who was born in June 2012. In November 2016, Gary filed for divorce. Although the record of the original divorce proceedings was not included in the record before this court, apparently at some point after Gary filed for divorce, Kira moved to Idaho with Braylee in violation

- 1 -

of court order. Thereafter, Gary was awarded temporary custody of Braylee subject to Kira's parenting time.

After Gary was awarded temporary custody of Braylee, Kira filed numerous reports with law enforcement and the Department of Health and Human Services (DHHS) alleging that, while in Gary's care, Braylee had suffered child abuse, child neglect, and sexual assault. The allegations were determined to be unfounded, and at least one of the reports indicated that "[a]t this point, it is apparent that Kira is reporting anything and everything before . . . her custody hearing . . . so she can possibly regain or gain custody of Braylee away from Gary."

Following the entry of the dissolution decree, which is not part of the record before this court, apparently Gary was awarded parenting time with Braylee every other weekend and Wednesdays after school. According to Gary, in 2021, the court modified the decree based upon the parties' stipulation, but it is unclear what portions of the decree were modified because, again, this document is not included in the record before this court.

In December 2023, Kira married Jacob Athen. At the time of the removal hearing, their blended family included Braylee; Kira's child from a prior relationship; Kira and Jacob's child; and Kira was pregnant with her and Jacob's second child. Additionally, Jacob had another son from a prior relationship, Wyatt Athen, who did not reside with them. Gary resided in Grand Island with his fiance.

### 2. Motion To Remove Braylee From Nebraska to Idaho and Response

In April 2024, Kira filed a motion seeking to remove Braylee from Nebraska to Idaho. She alleged that she remarried in December 2023 and that she and Jacob had one child and she was pregnant with their second child. Her motion further alleged that she wanted to relocate to Idaho for better education and employment opportunities for Jacob, better living arrangements, a better education system and more extracurricular activities for Braylee, to be closer to her family, and to help with Braylee's mental health. Kira also asserted that removal was in Braylee's best interests.

Gary objected alleging that Kira was seeking removal to deny him regular contact with Braylee, and that although a different physical location had advantages over Hall County, Nebraska, it was not a legitimate reason to remove Braylee from Nebraska.

### 3. Hearing on Application to Remove Braylee From Jurisdiction

A hearing on the application for permission to remove Braylee to Idaho was held in November 2024. The court received multiple exhibits including police reports, text messages, Braylee's individual education plan (IEP), and information regarding Kira's workers' compensation and social security disability benefits. Testimony was adduced from witnesses including Kira; Jacob, Kira's husband; Nikki Frenzen Bauer, Braylee's therapist; Gary; Gary's fiance; Braylee; Wyatt's mother; and Kira's father.

## (a) Kira's Testimony

Kira testified that she sought to remove Braylee to Idaho for multiple reasons including her desire to join Jacob, who had accepted new employment and had been accepted into flight aviation school; that there were better educational and extracurricular activities available to Braylee in Idaho; to get away from the bullying and harassment occurring in Nebraska; to allow Braylee to focus on her education and improve her mental health; and to be closer to Kira's family. Kira testified that Eagle, Idaho, was about a 15-hour drive from Grand Island, Nebraska.

The evidence showed that Braylee had special medical needs, including ADHD, anxiety, and asthma, and had an IEP at school since 2019. Kira testified that despite Braylee's IEP, Braylee struggled with reading and reading comprehension. Kira also testified that Wyatt bullied Braylee at school, and as a result, the school placed the children in separate classes; however, Kira acknowledged that, at the time of the modification hearing, Braylee was no longer attending the same school as Wyatt. In addition to the bullying Baylee experienced at school, Kira testified that her car had been egged, and that she and Braylee had been harassed by Wyatt's mother and some of Gary's associates. Kira testified that the move would put an end to the alleged harassment.

Kira testified that by relocating to Idaho, her family would be able to move to a bigger house and be closer to her family. Kira testified that she was raised in Idaho, that all of her family resided there, and they regularly visited, and that Gary's sisters and a few cousins also lived there. Kira also testified that Eagle, Idaho, was safer than Nebraska as demonstrated by a crime rating she located online.

Kira testified that moving to Idaho would allow Braylee to focus on school and her mental health without harassment and bullying and that there were better educational and extracurricular opportunities for Braylee in Idaho. Kira testified that Braylee struggled with socializing and making friends and felt as though she did not have any friends in Nebraska. Kira testified that neither she nor Braylee had ties to the community in Nebraska.

Kira also stated that if they were permitted to move, she would be able to work part time because she would have childcare assistance from her family, which she did not have in Nebraska. However, she acknowledged that her work hours would be limited due to her workers' compensation and social security disability benefits.

Kira testified that she and Braylee have an amazing relationship, and that Braylee also has a good relationship with her siblings and Jacob, whereas Gary and Braylee's relationship was strained because Gary consistently disappointed her. For example, Kira testified that Braylee felt disappointed when Gary initially attended her tonsillectomy appointment, but left before Braylee woke up. In addition, Kira testified that Gary did not always provide Braylee with her prescribed medications because he felt like she did not need them. Kira indicated that, generally, Gary was not actively involved with Braylee's medical issues or educational events and that Gary had attended only two of Braylee's six IEP meetings.

## (b) Jacob's Testimony

Jacob testified that at the time of the hearing, he was living in Idaho working as an independent contractor. Jacob testified that he worked 10-hour days and that his hours were more consistent than his work in Nebraska. Jacob testified that he accepted the position in April 2024

and that he left for Idaho around July. Jacob testified that he enrolled in flight school but withdrew pending the resolution of the motion to remove. Jacob testified that he believed that allowing Braylee to move to Idaho would be best for everyone.

(c) Frenzen Bauer's Testimony

Frenzen Bauer testified that she began therapy with Braylee in 2020 with the goal of helping Braylee cope with transitioning between her parents' homes, managing her anger issues, and teaching her to cope with her emotions. Braylee was discharged in March 2023 after successfully meeting her treatment goals but resumed counseling with Frenzen Bauer in September 2024 to address the "continued stress at [Gary's] house" and "struggling with transitions to and from" her parents' homes. Frenzen Bauer testified that Braylee reported issues related to bullying and issues with Gary. More specifically, Braylee reported that there are times that she did not feel supported by Gary, that Gary's failure to attend her medical appointments bothered her and caused her stress, and that she has endured emotional distress and emotional abuse from Gary and Gary's fiance. Frenzen Bauer testified that the emotional abuse suffered by Braylee caused "several different effects. You know, she struggles with. . . low self[-]esteem, anger, irritability, lacks self-confidence, [and] . . . struggles trusting." Frenzen Bauer testified that Braylee reported stressors in her life including when Gary "takes her around people she doesn't feel safe around," when he failed to attend her medical appointments, when he refused to give her prescribed medications, and when she experienced "emotional put-downs" from Gary's fiance when she expressed phrases such as, "Nobody likes you," "Nobody cares about you," "Nobody wants to see you again," "You're a liar just like your mom," and "I hate some people." Frenzen Bauer also testified that Braylee reported witnessing domestic violence between Gary and his fiance.

Frenzen Bauer testified that she had very little contact with Gary. Prior to the rescheduled court date, Gary had an appointment with her in which he "no-showed, no-called that appointment." But when the present court hearing was scheduled, only then did Gary attempt to reschedule an appointment which she was unable to accommodate.

Frenzen Bauer testified that a move to Idaho would "give [Braylee] a break from the stressors to be able to focus on her mental health and her academics." As it related to Braylee's relationship with Gary and the effect a move to Idaho would have on her, Frenzen Bauer testified that

> It's hard to say. We have never been in the situation yet; but based on what she has told me, I believe it would do [sic] her mental health and being able to focus on her academics, I think it would do it well. I think phone contact and Facetime and technology these days is great, and then hopefully they can still see each other on holidays and still make it possible to see each other.

During the time between Braylee's discharge from therapy and restarting with Frenzen Bauer, Braylee saw two other counselors. Frenzen Bauer testified that although Kira and Braylee reported the same issues they had with Gary, Frenzen Bauer "didn't ever feel that Kira was coaching Braylee" nor did she ever feel that Kira was attempting to alienate Braylee from Gary. As it related to moving to Idaho, Braylee reported to Frenzen Bauer that Braylee wanted "to move

and she thinks it would be good for her and her family, she has a lot of support there. She still loves her father, wants to see him, wants to talk to him. So, I mean, it was kind of a little of both."

### (d) Gary's Testimony

Gary testified that the first time he became aware of Kira's desire to move Braylee out of Nebraska occurred during a court case involving Wyatt's mother. Gary testified that in June 2024, Braylee informed him that she did not want to move to Idaho and that she would die if she did not get to see Gary anymore. Gary testified that although the parties' dissolution decree awarded him parenting time every other weekend and Wednesdays after school, Kira did not always accommodate his parenting time, and during the summer of 2024, Braylee did not visit him for 6 weeks. Gary stated that when the visits resumed, Braylee "completely changed to a different person."

Gary testified that the allegations of harassment were "unfathomable" and stated that "every time that we get ready to go to a court hearing, all of these things start increasing, and they say that we are doing things that [Kira and Jacob] are doing before we're able to . . . to argue those." Gary asserted that the allegations contained in police reports about him neglecting or assaulting Braylee were unsubstantiated. He further testified that Braylee never told him that she was afraid of him or said anything about not wanting to visit him.

Gary testified that since the initial divorce decree was entered, Braylee had been involved in therapy. Gary stated that, in 2018, Braylee started seeing her first counselor, Frenzen Bauer, who Gary claimed did not have time to talk to him, and he stopped attending sessions because it became "very uncomfortable to be there." After Braylee began seeing another counselor named Cindy Wallace, Gary claimed that Wallace was under the impression that Kira was manipulating Braylee. Gary stated that Kira subsequently changed therapists again. Gary testified that he believed that Kira manipulated Braylee and that Kira "shopped around" for a counselor until she found one who agreed with her. Gary testified that eventually Braylee resumed therapy with Frenzen Bauer, and that Frenzen Bauer's office did not respond to his request for a meeting. Gary denied Frenzen Bauer's claim that he no-called/no-showed for an appointment stating that he had not been notified that he had an appointment with Frenzen Bauer.

Gary testified that he and Braylee have a great relationship, and that Braylee gets along well with his fiance. He testified that he believed that Kira concocted the allegations against them to convince the court to allow her to remove Braylee to Idaho. Gary testified that he fears that if Kira is permitted to remove Braylee from Nebraska, he would not get to see Braylee, and that he would likely not get to speak with her via phone because, even while in Nebraska, Kira has blocked him on Braylee's phone. Gary testified that while he has missed some of Braylee's activities and events, he has coached Braylee's sports teams, volunteered at her school, and attended her parent/teacher conferences.

### (e) Gary's Fiance's Testimony

Gary's fiance testified that Kira's accusations that Braylee was afraid of her and that the home environment at her and Gary's house was threatening were "absolutely false" and that Kira's attempts to obtain protection orders against her were denied. She further testified that she and

Braylee are "really good friends" and that Braylee had never told her that she was fearful or intimidated by her. She further testified that she had observed the relationship between Braylee and Gary and described it as a great relationship; however, over the summer, Braylee stopped coming to her and Gary's house and visits were suspended, and that since the issue of moving to Idaho was raised, she has seen "a huge decline in [Braylee's] mental health and her personality."

### (f) Braylee's Testimony

Because Braylee testified during an in-camera interview that was sealed, we provide only a generalized summary of her testimony. Braylee testified generally that she was in seventh grade, she was involved in softball and soccer and wanted to play basketball. Braylee testified that she had experienced bullying at school, that school had "been kind of hard" for her, and that she would be attending a new school at the start of the school year.

Braylee testified that she enjoyed spending time with, and had a good relationship with, both of her parents but her relationship with Gary's fiance had been up and down. Braylee testified that she had visited Idaho, had many family members and friends there, that she wanted to move to Idaho, that she wanted to have summer and holidays with Gary, and that it was important to her to be able to see Gary.

### (g) Wyatt's Mother's Testimony

Wyatt's mother testified that the information that she received from the school regarding bullying was that Braylee was bullying Wyatt. Wyatt's mother denied harassing Jacob, Kira, or Braylee, but acknowledged that Kira had an active harassment protection order against her. She further admitted to illegally accessing Braylee and Kira's medical records at her previous employment, driving by Kira and Jacob's house, speaking with Jacob's parents, associating with Gary, and that after the issues regarding bullying started and Kira began attending lunch at the school, she also started attending lunch with Wyatt at the school.

### (h) Kira's Father's Testimony

Kira's father testified that he had witnessed Braylee's interactions with Kira and that Braylee and Kira have a good relationship. He also testified that he observed that Braylee "doesn't want to go" to parenting time with Gary and was "glad to be back" when she returned from the visits. Kira's father testified that he and other family members live in the same area of Idaho.

### 4. COURT'S ORDER

In December 2024, the district court denied Kira's motion for removal. In its order, the court found that "[a] history of parental conflict colors many of the factors." The court noted that there was evidence that Jacob's son Wyatt had bullied Braylee and that "Wyatt's mother . . . has conflict with [Kira] to the extent that the mother obtained a protection order against [her]." The court considered the factors with those issues in mind and found that "[w]eighing the totality of all of the relevant factors the Court finds that [Kira] has not met her burden of proof that the move is in the best interest of [Braylee]." Kira has appealed to this court.

## III. ASSIGNMENT OF ERROR

Kira's sole assignment of error is that the district court erred in finding that it was not in Braylee's best interests to allow her removal from Nebraska to Idaho.

## IV. STANDARD OF REVIEW

Questions concerning relocation and custody are initially entrusted to the discretion of the trial court. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). Although reviewed de novo on the record, the trial court's answer to such questions will ordinarily be affirmed absent an abuse of discretion. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition *Id.*

## V. ANALYSIS

Kira generally argues that the court erred in denying her motion to remove Braylee finding that removal was not in Braylee's best interests.

In parental relocation cases, trial and appellate courts deal with the tension created by a mobile society and the problems associated with uprooting children from stable environments. *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). Courts are required to balance the noncustodial parent's desire to maintain their current involvement in the child's life with the custodial parent's chance to embark on a new or better life. *Id.* These issues are among the most difficult issues that courts face in postdivorce proceedings. *Id.* It is for this reason that such determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given deference. *Id.*

In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020). After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.*

Fundamental constitutional rights underlie this framework. The custodial parent has the right to travel between states and the right to migrate, resettle, find a new job, and start a new life. *Id.* Both parents, custodial and noncustodial, have the constitutional right to the care, custody, and control of their children. *Id.*

### 1. LEGITIMATE REASON TO RELOCATE

The purpose of requiring a legitimate reason for leaving the state in a motion to remove a minor child to another jurisdiction is to prevent the custodial parent from relocating the child because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights. *State on behalf of Ryley G. v. Ryan G., supra*.

Here, the district court specifically found that "[Kira's] desire to reside in Idaho close to extended family members is a legitimate reason for removing [Braylee] from the State." Although Gary argues in his brief that Kira's motivation for seeking the move was to deny his opportunity to see Braylee, he did not file a cross-appeal assigning error to the court's finding that Kira proved

a legitimate reason to relocate. Generally, an appellee may not question a portion of a judgment at issue on appeal unless the appellee properly raises the issue by filing a cross-appeal. *Humphrey v. Smith*, 311 Neb. 632, 974 N.W.2d 293 (2022). Since neither party assigned error to the district court's finding that Kira proved a legitimate reason to relocate, we proceed to address whether removal is in Braylee's best interests. See, also, *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014) (appellate court will not address threshold question of whether parent had legitimate reason to relocate where court's holding on best interests is dispositive).

## 2. BEST INTERESTS

Kira argues that the court erred in finding that she failed to prove that removal to Idaho was in Braylee's best interests.

To determine whether removal to another jurisdiction is in the child's best interests, a trial court should consider (1) each parent's motive for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and noncustodial parent when viewed in the light of reasonable visitation. *Korth v. Korth*, 309 Neb. 115, 958 N.W.2d 683 (2021). These three considerations are not exhaustive, nor will they be present in every case. *Id*. It is the moving party's burden to show, by a combination of these considerations, that removal would be in the child's best interests. *Id.* When the evidence concerning one of these considerations is in conflict, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts over another. *Id.*

In considering the three factors, the Nebraska Supreme Court explained in *Steffy v. Steffy*, 287 Neb. 529, 538-39, 843 N.W.2d 655, 663-64 (2014):

> The first consideration is each parent's motive for seeking or opposing the move. The ultimate question for this consideration is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party.
>
> The second consideration is the potential that the move holds for enhancing the quality of life for the child and the custodial parent. To determine quality of life, a court should consider the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted.
>
> The final consideration in the best interests analysis is the impact such a move will have on contact between the child and the noncustodial parent. This effect must be viewed in light of the court's ability to devise a reasonable visitation arrangement that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. The determination of reasonableness is to be made on a case-by-case basis.

Here, the district court found that the following factors weighed in favor of removal: Braylee's emotional, physical and developmental needs; Braylee's preference to move to Idaho (slightly weighed in favor of removal); and the strength of Braylee's ties to the present community and extended family in Nebraska.

The district court found that the following factors weighed against removal: the existence of educational advantages (weighed slightly against removal); and the quality of the relationship between Braylee and Gary in that a move would affect Gary's parenting time and further strain their relationship (weighed "heavily against" removal).

The district court found that the following factors neither weighed in favor of or against removal: the extent to which Kira's income or employment would be enhanced; the degree to which housing or living conditions would be improved; the likelihood that allowing or denying the move would antagonize hostilities between the parties; and the living conditions and employment opportunities for Kira.

After conducting our de novo review of the record, we find no abuse of discretion in the district court's finding that removal was not in Braylee's best interests. In reaching that result, we agree with the district court that some factors weighed in favor of removal, some factors weighed against removal, and some factors were neutral. But, as the district court noted, the factor that weighed most heavily on this record was the impact that a move would have on Gary's relationship with Braylee. In that regard, there was conflicting testimony provided by both parties. From Gary's perspective, he had an important and meaningful relationship with his daughter, and Braylee expressed a similar sentiment. From Kira's perspective, Gary was abusive and created a hostile environment for Braylee and she desired to remove Braylee from that environment. As it related to that conflicting testimony, the district court noted that the hostility between Gary and Kira "colored" their testimony. For instance, Kira had previously removed Braylee to Idaho without the court's permission and made numerous allegations to law enforcement and/or DHHS about Gary, all of which were determined to be unfounded, and Kira was suspected of utilizing these claims to obtain leverage in custody proceedings. And although Frenzen Bauer expressed a certain frustration with Gary, Gary indicated that therapist Wallace believed Kira was coaching Braylee, which led to Wallace's termination as Braylee's therapist. In short, the district court found Gary's testimony to be more credible than Kira's. And, when it comes to credibility determinations, the Nebraska Supreme Court has consistently held, "[i]n child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another." See *Tilson v. Tilson*, 307 Neb. 275, 303-04, 948 N.W.2d 768, 789 (2020).

The district court found that a move to Idaho might assist in Braylee's emotional, physical, and developmental needs; that Braylee expressed a preference to move there, subject to retaining her relationship with Gary; and that there were more family ties in Idaho than in Nebraska. But, notwithstanding Kira's assertions that a move to Idaho would enhance her employment opportunities, improve their living conditions, and relieve hostilities between the parties, the district court found that Kira failed to meet her burden that these factors weighed in favor of a move. We find no abuse of discretion with these findings. And, in light of the importance the

district court placed on Gary being able to continue to foster his relationship with Braylee, which would be frustrated with a move involving this much distance, we reject Kira's contention that the court erred in disallowing Kira's request to remove Braylee to Idaho.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's denial of Kira's request to remove Braylee from Nebraska to Idaho.

AFFIRMED.