IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PERLMAN V. PERLMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ECHO N. PERLMAN, NOW KNOWN AS ECHO N. KOEHLER, APPELLEE,

V.

BEN G. PERLMAN, APPELLANT.

Filed September 5, 2023.    No. A-22-966.

Appeal from the District Court for Douglas County: KATIE L. BENSON, Judge. Affirmed.

Ben G. Perlman, pro se.

Courtney R. Ruwe and Kathryn D. Putnam, of Astley Putnam, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Ben G. Perlman appeals the Douglas County District Court's order denying his request for sole legal and physical custody of his minor children and modification of his parenting time. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. HISTORY OF PARTIES AND PROCEEDINGS

Ben and Echo N. Perlman, now known as Echo N. Koehler, were married in September 2009. During their marriage, they had 2 children: Norah, who was born in 2010, and Ruby, who was born in 2013. The parties were divorced in March 2017 pursuant to a consent decree which was subsequently corrected by an order nunc pro tunc. The decree, as corrected, awarded Echo sole legal custody and primary physical custody of Norah and Ruby subject to Ben's parenting time. Ben's parenting time was defined as every Wednesday at 5 p.m. until Thursday at 8 a.m.,

- 1 -

every other weekend from Friday at 5 p.m. until Sunday at 7:30 p.m., and every other Tuesday at 5 p.m. until Wednesday at 8 a.m. During regular school weeks, Ben received 5 out of every 14 overnights with the minor children. When school was not in session on Monday following Ben's weekend visitation, Ben's parenting time was extended to Monday at 8 a.m. and, when school was not in session on Friday, Ben had overnight parenting time on Thursday unless it occurred on the week he exercised parenting time on Tuesday and Wednesday.

Additionally, the parties agreed to a provision regarding changing the children's residence which stated:

O. CHANGE OF RESIDENCE: In the event either parent moves, the new address shall be provided to the other parent prior to the proposed change of residence so as to allow time for mediation of a new agreement concerning custody, parenting time, visitation, or other access. The children's residence shall not be changed from the State of Nebraska without the prior written permission of the Court.

The parties' dissolution decree was amended in November 2019. This order, which was sealed, did not alter the previous order regarding legal and physical custody but did note that the parties had agreed that

[Ben] is entitled to have parenting time with the children on Thursday overnights on weeks where BOTH of the following conditions occur:

(i) The children do not have school on Friday; and

(ii) It occurs on the week that [Ben] only has parenting time on the Wednesday preceding the "off school" Friday.

To clarify the parties' interpretation of this provision (set forth in Paragraph C of the parties' Original Parenting Plan), the parties agree that this provision shall apply during the children's school breaks in addition to the school year.

In June 2021, Echo filed a complaint to modify the parties' parenting time schedule due to her prospective move from Omaha, Nebraska, to Fairbury, Nebraska. Echo requested that the court "modify [Ben's] parenting schedule in a manner that allows him to have the same number of overnights with the children each year, and that can be feasibly executed after [Echo] and the children's relocation to Fairbury[.]" Ben filed a cross-complaint for modification requesting sole legal and physical custody of the minor children. In January 2022, the district court overruled both parties' requests for modification based upon its finding that neither party had shown a material change of circumstances.

## 2. FACTS GIVING RISE TO CURRENT MODIFICATION PROCEEDINGS

On April 21, 2022, Echo notified Ben that she and the children were moving to Lincoln at the end of May. In response to Echo and the children's relocation to Lincoln, Ben filed a complaint for modification in June 2022. He again requested sole legal and physical custody of the minor children alleging that Echo's move to Lincoln was not in the children's best interests, the move substantially interfered with his parenting time, and that Echo's failure to co-parent "[was] such

that her having sole legal and primary physical custody of the children is no longer in the children's best interests."

In September 2022, the court entered a temporary order based upon a temporary agreement reached by the parties which, among other things, awarded the following parenting time to Ben while the children's school was in session – Ben was to have overnight visitation every Wednesday beginning at 5 p.m. lasting until Thursday morning at 6:30 a.m. and weekend visits every other weekend from Friday until Monday morning at 7:30 a.m. This change still resulted in Ben receiving 5 out of 14 overnights with the children while reducing the minor children's transportation time. Ben was also awarded "parenting time with the children on Thursday overnights on weeks where BOTH of the following conditions occur: (1) the children do not have school on Friday; and (2) It occurs on the week that [Ben] only has parenting time on the Wednesday preceding the 'off school' Friday." The order further provided that transportation was to be provided by Echo except for the Monday morning drop-offs which were to be made by Ben.

### 3. MODIFICATION HEARING

The hearing in this matter was held over one day in November 2022. During the hearing, testimony was adduced from Ben; Echo; Omaha police officer Richard Lutter; Marian Fey, Ben's partner; and the children's maternal grandmother. Additionally, both children testified in camera with the parties' attorneys, but not the parents, present. We have reviewed the children's testimony but do not describe it in detail due to the district court's assurances to the children that the content of their testimony would not be revealed to their parents.

### (a) September 2022 Incident

Numerous parties testified regarding an incident that occurred on September 14, 2022. On that date, Echo had driven the children to Omaha for Ben's parenting time. Upon arriving at Ben's home, Norah became upset and stated that she wanted to return to Lincoln. Ben stated that Norah was crying and having a "panic attack." After Echo refused Ben's instruction to leave, Ben called the police. Echo waited in her vehicle parked on the street a few car lengths away from Ben's residence. Officer Lutter was one of two officers to respond.

Officer Lutter testified that he was called to check on the well-being of a child regarding parents not being able to determine where the child was going to be staying that night. When he arrived at the scene, Ben, his partner Marian, and Norah were outside of the Ben's residence. Echo was waiting in her vehicle parked on the street a few car lengths away from Ben's residence. Norah was distressed, crying, and did not want to stay at Ben's home that evening. After discussing the situation with the officers, Ben, although he wanted the children to stay, allowed the children to leave with Echo.

Ben claimed that Echo's refusal to leave Norah with him "escalated the situation" and "further aggravated the anxiety and panic attack that [Norah] was having . . ." He claimed that Echo, who was in her car that had been parked in his driveway, was "trespassing" and that calling the police was de-escalating the situation.

(b) Ben's Testimony

Ben testified that, prior to the move, he worked on homework with Ruby, attended parent-teacher conferences for both children, attended PTO/PTA meetings, and was very involved with the children's schools, including volunteering for class parties, field trips, and field days. He also testified that sometimes he was able to eat lunch with the children but acknowledged that he did not have parenting time during school hours, so those visits occurred during Echo's parenting time. On days when Ben had parenting time, he stated that

> [o]ur typical routine is Norah would get there at 5:00 p.m. and she wouldn't be tired at all. We would cook dinner. She would help with that, probably, 50% of the time. We would have dinner together. We would go on walks every single day, which we still do unless the weather [is bad.] . . . Then we would spend time together, playing games together; board games. Norah would read . . .

He also stated that Norah was talkative prior to the move.

Ben opined that Echo moved to Lincoln for the sole purpose of being able to live with her boyfriend and that she was not acting in the children's best interests. Ben testified that, since Echo and the children moved to Lincoln, he has exercised additional parenting time and has attended PTO/PTA meetings but that it was more difficult to have a relationship with the children's teachers. He also testified that it was "exhausting" for the children to drive back and forth from Lincoln and Omaha and that "[t]hey took pillows and blankets in the car and they slept." He stated that, since the move, Norah goes to bed very early at his home and she has become distant, anxious, withdrawn, angry, and despondent. He stated that Norah's behaviors are atypical and extreme, that she has experienced a "rapid" and "extraordinary deterioration," and that she "doesn't even look the same anymore." Ben also expressed concern about Norah not bringing any homework to his home, her missing assignments, and her grades, which he stated had dropped. Although Ben expressed concern over Norah's math grades in particular, a recent email from Norah's math teacher which stated, "I'd say she's doing great."

Although Ben admitted that he was receiving 5 overnight visits in a two-week period, he disagreed with the statement that, pursuant to the temporary order he traded a Tuesday overnight every other week for the Sunday overnight. He stated that

> I was the one who offered to give up Tuesdays in exchange for Sundays. That was my proposal, and the reason I did that was because of the mental anguish it was causing for my children to drive several hundred miles every week. And so what I proposed and what we agreed to was I would give up having my children Tuesdays from 5:00 p.m. . . . until the next morning every other week – the Tuesdays in exchange for having the girls spend the night on Sunday nights. That's what this temporary plan is.

> But what is misleading is to imply that those equate with one another. Because three hours on Tuesday before they go to bed and waking up is not an even exchange . . . with the Sundays. Because on Sundays my children used to get picked up at 7:30 p.m., and now they're going to sleep at 8:00 p.m. Not only are they going to sleep at 8:00 p.m., they're waking up at 5:30 in the morning. So instead of having my children from 5:00 p.m. Tuesday

until the morning, I now have them that extra 30 minutes, and I guess overnight . . . on Sundays.

So . . . it's not an even trade. Not only that, it lessens the meaningful, consistent time with my children.

### (c) Marian's Testimony

Marian described Ben's relationship with the children prior to the move as "very close" and "very loving" and her relationship with the children as "warm" and "friendly." She stated that, prior to the move, Ben attended PTA meetings, school events, and the children's extracurricular activities. However, she admitted that she and Ben still participate in activities with the children, that Ben has attended PTA meetings in Lincoln, took Ruby to dinner prior to a PTA meeting, and that Ben recently participated in a "Harry Potter night" with Ruby at her school.

According to Marian, prior to the move, Norah would go to bed between 8 p.m. and 9 p.m. on a school night, but after the move, Norah "typically wants to go right to her room and go to bed" at 5 p.m. which Marian described as "unusually early." Marian testified that, since the move to Lincoln, she has noticed "[h]eightened anxiety" in the children, as well as "less closeness" and a reluctance to engage in activities that they used to enjoy.

### (d) Maternal Grandmother's Testimony

The children's maternal grandmother testified that Ben facilitates her contact with Norah and Ruby and that Echo does not allow her to have contact with the children. According to the grandmother, prior to the move to Lincoln, the children were talkative and happy to see her and she was able to spend time with the children and attend school functions. Since the move, she sees the children less frequently, the children are less talkative, and they are more distant. Further, since the move, she has not been able to attend any of the children's school functions. She described that there is increased conflict and fighting between Norah and Ruby. However, she admitted that the time that she spent with the children prior to the move was during Ben's time, which would not be impacted by the children's move to Lincoln.

### (e) Echo's Testimony

Echo testified that she notified Ben that she and the children were moving to Lincoln on April 21, 2022. She signed the deed for the home on April 22. They moved to Lincoln at the end of May. Due to the move, Echo offered to engage in mediation with Ben regarding changes needed in their parenting plan to facilitate his parenting time. Echo and Ben did not engage in mediation and Ben did not miss any of his parenting time with the minor children except for a few days when he was out of town for work. Echo stated that it was her understanding that she was not prohibited by the court from moving from the Omaha metropolitan area and that she believed the move had not substantially interfered with Ben's parenting time.

Echo testified that she moved to Lincoln "[t]o improve [the] quality of life" for herself and the children. She stated that she believed Lincoln schools were better, that Norah was receiving education geared toward gifted students, and that Echo had a bigger support system in Lincoln.

She testified that they went from living in a short-term temporary rental of a small apartment to a 5-bedroom house which she purchased with her boyfriend. However, she admitted that the reason that she and the children were residing in a small apartment was because she sold her Omaha home and chose to move into an apartment. She also testified that she grew up in Lincoln, she had attended the school that Norah was currently attending, her support system was in Lincoln, and she was closer to her partner, who resides in Fairbury, Nebraska. Further, her work was remote so she could perform her job from Lincoln. Echo denied moving to frustrate Ben's parenting time or to harm his relationship with Norah and Ruby.

Echo testified that Norah attends 7th grade at Irving Junior High School. The school is located between 6 to 8 blocks from her home and that Norah has friends in their neighborhood. Norah is in advanced placement at her school due to her high scores on standardized tests. Echo acknowledged that Norah had some missing assignments in her classes but attributed it to being sick or missing school for an out-of-town family event. Echo opined that Norah is stressed about homework but attributes it to Norah being "for the first time in her life challenged in a subject." Norah stated that the expectation is for Norah to do her homework every night, and if she does not meet that expectation, the consequences include not being able to do something that she wants to do, like watch a movie or have a friend over during the weekend. Since the move, Norah has had friends from both Omaha and Lincoln over to her home.

Echo stated that within the last month, Norah has been showing more stress. However, Echo testified that at her home, Norah does not go to bed right away after getting home from school, does not seem withdrawn or distant, and does not seem disinterested in activities. To the contrary, Echo stated that Norah asked to take bass lessons, and at the time of the hearing, Norah was participating in bass lessons and sometimes participated in an informal activity at school called "Safe Space," which is "an LGBT plus allies group." Additionally, in October 2022, Norah resumed seeing her counselor. Echo also opined that Norah's stress had increased due to increased conflict with Ben and having to testify in front of the judge in this case.

Ruby attends 4th grade at Sheridan Elementary school. The school is located 4 blocks from her home, which allows Ruby to walk home with a friend. Echo described Ruby's grades as "excellent." Echo testified that, since the move, Ruby does not appear more tired than normal and is not withdrawn or distant. Ruby has been actively participating in school activities, including an "extra singing opportunity," where she practiced for a few weeks and performed the national anthem at a Lincoln Saltdogs baseball game. She also attended a "Harry Potter night" at her school with Ben after Echo gave Ben her ticket.

Echo testified that, in her opinion, remaining in her custody was in the children's best interests because

> Currently, I'm basically a stay-at-home mom the way my schedule works. So I have availability during the day, when they're sick to be home with them. I take them to school, I pick them up. For the most part I'm able to work around their schedules, and so there's a lot of flexibility. . . . I've been their primary caregiver since they were born . . .

She further testified that she and the children have a close relationship and they do activities together including going to the park, attending school activities, and going for walks. She further

testified that if Ben was awarded custody of the children it would harm the children because they would

> be pulled from schools that they're doing well in and enjoying. Norah would have to go to an entirely new school, because coming back to Omaha wouldn't put her back in the school she was [in] last year. She's now in junior high, so she would have to reestablish yet again [at] another new school. But, I mean, between the girls and I, I think it would upset them very much because they have been scared about what's going to happen. And so I think it would only contribute to problems, not make things better for them . . .

Echo testified that she has to pick up the children on Thursday mornings at 6:30 a.m. in order to get them to school on time. She further testified that the car rides do not make the children any more tired than they normally are and that the children are able to do homework in the car.

### 4. CURRENT COURT ORDER

The court found that Echo's move to Lincoln with the two minor children, who had been settled in the Omaha Public School system and lived near Ben, created a material change in circumstances. The court noted that Echo

> made the decision to move within six months of the modification trial where she was seeking to move to Fairbury, Nebraska. From the evidence adduced at trial, it appears this move was mainly done to serve the interests of [Echo] and had little to do with the children at issue in this case. However, the Court also notes that [Echo] has sole legal and physical custody (agreed to by [Ben]) and that a person should not be confined from moving on with their life. . . . It is also apparent from the testimony that a move of such distance was not contemplated by [Ben] at the time he agreed to the original Decree and that while he still has the same amount of overnights with the children, the distance has strained his relationship with his daughters and impacts his ability to attend or participate in activities. However, other evidence establishes the two children are doing well overall, personally and in school, in Lincoln, Nebraska.
>
> As noted by [Echo], an intrastate move is not in itself a material change, but the facts in this case establish the move created changes to the original Parenting Plan and that is further shown through the necessity of the parties needing a temporary order in this case since transportation and [Ben] having two weekly overnights was no longer feasible. The evidence at trial established these changes adopted into the temporary order have worked and are in the best interest of the children.

Thus, the court determined that, collectively, the evidence established that a material change had occurred and that it was in the children's best interests to modify Ben's parenting time as follows:

> SCHOOL YEAR: Similar to the current temporary order, [Ben] shall have every Wednesday at 5:00 p.m. to Thursday at 6:30 a.m. The parties shall alternate weekends. The weekend shall be defined as Friday at 5:00 p.m. to Monday at 6:30 a.m. [Ben] is also entitled to have parenting time with the children on Thursday overnights on weeks where BOTH of the following conditions occur: (1) the children do not have school on Friday;

and (2) it occurs on the week that [Ben] only has parenting time on the Wednesday preceding the "off school" Friday.

SUMMER: Beginning the first Sunday following the child being released from school for summer vacation the parties shall share physical custody of the minor child on a week on, week off schedule. Parenting time over the summer shall begin and end at 5:00 [p.m.] on Sunday evening. The first week of summer parenting time shall be with [Ben]. The following week shall be with [Echo].

The court's order further provided that Echo was to provide all transportation and that exchanges were to be made curbside at Ben's house. The court denied Ben's request for the court to award sole legal and physical custody of the minor children to him. Ben has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Ben's assignments of error, consolidated and restated, are that the district court abused its discretion in denying his complaint for modification to grant him legal and physical custody because the court (a) failed to conduct a removal analysis pursuant to *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), and (b) failed to "state, consider, or analyze the necessary and appropriate factors in determining whether the move to Lincoln was in the children's best interest[s.]"

He also contends that the district court abused its discretion in adopting a parenting plan which (a) reduced his overnight parenting time; ordered that his visitation time was to end at 6:30 a.m., rather than 8 a.m. when school was not in session; and failed to reconcile other provisions of the parenting plan; and (b) failed to hold the parties to their initial agreement regarding parenting time set forth in the parenting plan attached to the original dissolution decree.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020).

## V. ANALYSIS

### 1. DENIAL OF COMPLAINT FOR MODIFICATION

Ben first contends that the district court's denial of his complaint for modification in which he sought sole legal and physical custody was an abuse of discretion because the court (a) failed to conduct a removal analysis pursuant to *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), and (b) failed to "state, consider, or analyze the necessary and appropriate factors in determining whether the move to Lincoln was in the children's best interest[s.]"

### (a) Applicability of *Farnsworth* Removal Analysis

Ben contends that the Farnsworth removal analysis used for modifications of interstate removals of children from the jurisdiction should also apply to intrastate moves. He contends that

Echo did not have a legitimate purpose for moving from Omaha to Lincoln and thus would not meet the first step in the *Farnsworth* removal analysis.

We considered the applicability of the *Farnsworth* removal factors to intrastate moves in *Bohnet v. Bohnet*, 22 Neb. App. 846, 862 N.W.2d 99 (2015). In *Bohnet*, the mother requested a modification of child custody based upon the father's proposed in-state move which would result in a 148-mile distance between the mother and father's residences. We framed the issue as

> whether the analysis required when a parent seeks to relocate with a minor child from Nebraska to another state also applies to intrastate moves. Specifically, does *Farnsworth v. Farnsworth,* 257 Neb. 242, 597 N.W.2d 592 (1999), apply when a move within Nebraska creates a distance of 148 miles between parental households and therefore requires modification to an existing parenting plan.

*Bohnet v. Bohnet*, 22 Neb. App. at 846-47, 862 N.W.2d 99. We held that "when considering custody and parenting time issues within the state, neither our Supreme Court nor the Legislature has made that the current state of the law, and therefore, we continue to decline to require the application of the *Farnsworth* analysis to intrastate moves." *Bohnet v. Bohnet*, 22 Neb. App. at 854, 862 N.W.2d 99 at 105.

Despite our finding that the *Farnsworth* removal factors were not applicable to intrastate moves, Ben argues that applying the *Farnsworth* standard to intrastate moves "is not inconsistent with *Bohnet v. Bohnet*, 22 Neb. App. 846, 862 N.W.2d 99 (2015)" because *Bohnet* "[left] open the question of how to address intrastate removal of children where there is no legitimate purpose" for the move. Ben's interpretation of our holding is incorrect. Contrary to Ben's claim that the *Bohnet* court "found that the custodial parent relocated for a legitimate reason," our opinion makes no such finding. Rather, we specifically rejected the invitation to apply the *Farnsworth* threshold issue of whether the custodial parent had a legitimate reason for removing the children from the jurisdiction. Accordingly, the district court did not abuse its discretion in failing to conduct a legitimate reason analysis, because there is no such threshold requirement associated with an intrastate move.

We further decline Ben's request to reconsider "the *Bohnet* standard as applied to intrastate moves generally." Brief for appellant at 34-35. The doctrine of stare decisis requires that we adhere to our previous decisions unless the reasons therefor have ceased to exist, are clearly erroneous, or are manifestly wrong and mischievous or unless more harm than good will result from doing so. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 953, 932 N.W.2d 692, 707 (2019). The petition for further review of our opinion in *Bohnet v. Bohnet*, 22 Neb. App. 846, 862 N.W.2d 99 (2015), was denied by the Nebraska Supreme Court and *Bohnet* remains the law in Nebraska. The district court applied the appropriate standard regarding modification of custody orders which provides that:

> Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. Modifying a custody or parenting time order requires two steps of proof. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the

previous custody order and that affects the best interests of the child. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests.

*Lindblad v. Lindblad*, 309 Neb. 776, 788, 962 N.W.2d 545, 554-55 (2021). This assignment of error fails.

### (b) District Court's Best Interests Analysis

Ben next contends that the district court failed to "state, consider, or analyze the necessary and appropriate factors in determining whether the move to Lincoln was in the children's best interest[s.]" Brief for appellant at 34.

Although Ben now contends that the district court's order contained insufficient analysis regarding its best interests determination, he did not request such findings before the final submission of the case to the district court.

In the absence of a request by a party for specific findings, a trial court is not required to make detailed findings of fact and need only make its findings generally for the prevailing party. *Hall v. County of Lancaster*, 287 Neb. 969, 846 N.W.2d 107 (2014), *overruled on other grounds, Davis v. State*, 297 Neb. 955, 902 N.W.2d 165 (2017). See Neb. Rev. Stat. § 25-1127 (Reissue 2016). The Nebraska Supreme Court has held that "even where our civil procedure code mandates specific findings, it does so only upon a party's request." *Becher v. Becher*, 299 Neb. 206, 215, 908 N.W.2d 12, 23 (2018). Nebraska case law provides that motions for specific findings of fact pursuant to § 25-1127 must be made "before the final submission of the case to the court." *Stuczynski v. Stuczynski,* 238 Neb. 368, 370, 471 N.W.2d 122, 124 (1991).

*Schroeder v. Schroeder*, 26 Neb. App. 227, 237-38, 918 N.W.2d 323, 332 (2018) (action involving modification of custody). Since Ben did not request that the district court provide detailed factual findings, the court was not under any obligation to do so.

Although the district court did not make explicit factual findings, it is clear that the court did perform a best interests analysis here, and after considering all of the evidence, including but not limited to the in camera testimony of the children, the court determined that it was in the children's best interests to remain in Echo's custody subject to adjustments to Ben's parenting time to accommodate the additional distance between the parties' homes. After a thorough review of the record, while giving weight to the fact finder, we cannot say that the court's failure to change custody on these facts was an abuse of discretion. This assignment of error fails.

### 2. ALLEGED ERRORS RELATING TO PARENTING PLAN

Ben's second assignment of error alleges that the district court erred in crafting a parenting plan that resulted in a net reduction of his parenting time with Norah and Ruby. He claims that (a) the new parenting plan reduced his overnight parenting time; reduced his parenting time in mornings by providing that his visitation time ended at 6:30 a.m., rather than 8 a.m., even when school was not in session; failed to reconcile other provisions of the parenting plan such as his 1

hour of Halloween visitation that he states "is now impossible to exercise" and the 10-day vacation time awarded to each parent which he asserts could be used by Echo "to cut into [his] week-to-week summer vacation time"; and (b) failed to hold the parties to their initial agreement regarding parenting time set forth in the parenting plan attached to the original dissolution decree.

The Parenting Act does not require any particular parenting time schedule to accompany an award of either sole or joint physical custody, and there exists a broad continuum of possible parenting time schedules that can be in a child's best interests. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). A visitation schedule is generally considered reasonable if it is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002). There is not a certain mathematical amount of visitation that is considered reasonable; the determination of reasonableness is to be made on a case-by-case basis. *Id*.

(a) Reduction in Parenting Time

Ben's allegations relate to his claim that the parenting plan adopted by the district court resulted in a net decrease of his parenting time with Norah and Ruby. However, in *Jones v. Jones*, 305 Neb. 615, 631-32, 941 N.W.2d 501, 513 (2020), the Nebraska Supreme Court found that a court order changing the parents' parenting time schedule to reduce the number of overnights with the noncustodial parent during the school year while still affording liberal parenting time and allowing the minor child to spend equal time with both parents over the summer months, was in the child's best interests and did not constitute an abuse of discretion.

The court's modification order modified Ben's parenting time as follows:
SCHOOL YEAR: Similar to the current temporary order, [Ben] shall have every Wednesday at 5:00 p.m. to Thursday at 6:30 a.m. The parties shall alternate weekends. The weekend shall be defined as Friday at 5:00 p.m. to Monday at 6:30 a.m. [Ben] is also entitled to have parenting time with the children on Thursday overnights on weeks where BOTH of the following conditions occur: (1) the children do not have school on Friday; and (2) it occurs on the week that [Ben] only has parenting time on the Wednesday preceding the "off school" Friday.
SUMMER: Beginning the first Sunday following the child being released from school for summer vacation the parties shall share physical custody of the minor child on a week on, week off schedule. Parenting time over the summer shall begin and end at 5:00 [p.m.] on Sunday evening. The first week of summer parenting time shall be with [Ben]. The following week shall be with [Echo].

Additionally, the provisions contained in the original dissolution decree and the 2019 modification degree remain intact. For example, the parties' holiday schedules remain in place and the holiday schedules supersede regular parenting time and vacation time schedules and may not be preempted absent mutual agreement by the parties. Thus, Ben retains holiday parenting time for the Memorial Day weekend, the Labor Day weekend, 1 hour on Halloween, Thanksgiving Eve at 5 p.m. until 2 p.m. on Thanksgiving Day, Christmas Day starting at 3 p.m. and ending on

December 26 at 7 p.m., and Father's Day beginning at 9 a.m. and ending at 7:30 p.m. Additionally, Ben has "up to 10 days of vacation each year."

We further note that pursuant to previous parenting plans, Ben was at least partially responsible for transportation for the children, whereas pursuant to the current plan, Echo is responsible for all of the children's transportation. Thus, time with the children that was previously spent during transporting the children is now free for other activities.

Here, the district court was presented with a situation wherein Ben and Echo no longer live in the same community and was required to fashion a parenting plan that included parenting time for Ben to nurture his relationship with Norah and Ruby, but also considered the children's schooling, extracurricular activities, and their time with Echo. We recognize Ben's desire to remain actively involved in his children's lives, but also note that the children's best interests are paramount in determining how and when that parenting time should be exercised. See *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022) (best interests of children are primary and paramount considerations in determining and modifying parenting time). Here, similar to the facts in *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020), the parenting plan crafted by the district court still afforded Ben liberal parenting time. And, although the parenting plan might result in the children spending fewer overnights with Ben during the school year, the plan was in Norah and Ruby's best interests and did not constitute an abuse of discretion.

### (b) Effect of Stipulated Dissolution Decree

Ben also contends that the district court abused its discretion by failing to hold the parties to their initial agreement regarding parenting time set forth in the parenting plan attached to the original dissolution decree. He argues that Echo "violated the agreement by making it such that visitation as agreed upon is no longer feasible." Brief for appellant at 40.

We interpret Ben's argument as a claim that Echo's in-state move to Lincoln violated the parties' original custody agreement. However, the Nebraska Supreme Court has held within the context of out-of-state removal jurisprudence that an award of custody to a parent should not be interpreted as a sentence of immobility, *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020), and this court has interpreted that this proposition applies equally to intrastate moves. See *Crow v. Chelli*, No. A-21-100, 2022 WL 697723 (Neb. App. Mar. 3, 2022), *review denied* (June 29, 2022) (father's decision to relocate children from Omaha to Arnold and enroll them in local public school fell within father's authority and responsibility as parent with sole legal and physical custody).

We also note that the rule that custody and parenting time of minor children shall be determined on the basis of their best interests clearly envisions an independent inquiry by the court. See *Lautenschlager v. Lautenschlager*, 201 Neb. 741, 272 N.W.2d 40 (1978). See, also, *Kelly v. Kelly*, 29 Neb. App. 198, 952 N.W.2d 207 (2020). The duty to exercise this responsibility cannot be superseded or forestalled by any agreements or stipulations by the parties. *Lautenschlager v. Lautenschlager, supra*. See, also, *Kelly v. Kelly, supra*. It continues throughout the period of the minority of the child even without objections or requests on the part of the parents. *Lautenschlager v. Lautenschlager, supra*.

Here, upon Ben's complaint for modification, the district court found that Echo's move to Lincoln with the minor children constituted a material change in circumstances and then proceeded to determine that the children's best interests required a modification to the parties' parenting time agreement. This determination was within the court's responsibility to conduct an independent inquiry into the children's best interests. This assignment of error fails.

## IV. CONCLUSION

Having considered and rejected Ben's assigned errors, we affirm that district court's order in its entirety.

AFFIRMED.