IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

IN RE INTEREST OF LUKAH C. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LUKAH C. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CYNTHIA C., APPELLANT, AND JUAN B. ET AL., APPELLEES.

Filed November 19, 2024.    No. A-24-115.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed in part, and in part reversed and remanded with directions.

Thomas C. Riley, Douglas County Public Defender, and Nicole J. Tegtmeier for appellant.

Jackson Stokes, Deputy Douglas County Attorney, for appellee State of Nebraska.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Cynthia C. appeals the order of the separate juvenile court of Douglas County that terminated her parental rights to her four children, denied her motion for continued visitation pending an appeal, and determined that the children's therapists would decide whether there would be a final goodbye. For the reasons that follow, we affirm the court's termination of Cynthia's parental rights and denial of her motion for continued visitation but reverse the court's delegation of judicial authority to the children's therapists. Accordingly, we affirm, in part, and in part, reverse and remand the cause with directions to determine whether a final goodbye should occur.

- 1 -

## II. BACKGROUND

### 1. FACTUAL BACKGROUND

Cynthia is the biological mother to five children, Lukah, born in 2015, Angel, born in 2016, Xylianna, born in 2019, Dandilo, born in 2020, and Kaivian, born in 2021. These proceedings do not concern Kaivian.

Cynthia became involved with the Nebraska Department of Health and Human Services (DHHS) on a voluntary basis in July 2019, after several reports were made concerning her children. In May 2019, there was a report that she was using methamphetamine while caring for them. And in June, there was a report that Xylianna suffered head trauma after Lukah pushed her to the ground and stomped on her. While both reports were found to be unsubstantiated, DHHS was still concerned for the children's well-being and offered voluntary services to Cynthia.

On August 2, 2019, DHHS was conducting a wellness check when the person conducting the check witnessed Lukah and Angel throwing things out of an upstairs window and hanging out of it. This person attempted to have the children wake up Cynthia but was unsuccessful. Because of this, local law enforcement was called. The responding officer banged on the window for approximately 50 minutes before Cynthia woke up. After she woke up and let the officer inside, he noticed that the floor was littered with dirty clothing, trash, and stale vomit and that the wall was smeared with old food. Due to this incident and the state of the home, Cynthia was arrested, charged with child abuse, and the children were placed in the temporary custody of DHHS.

On August 5, 2019, the State of Nebraska filed an ex parte motion for immediate custody alleging Lukah, Angel, and Xylianna fell within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). This motion alleged the children lacked proper parental care because (a) Cynthia was incarcerated; (b) the family home was in a condition that placed the children at a risk for harm; (c) Cynthia failed to provide proper parental care, support, and/or supervision; (d) Cynthia failed to provide safe, stable housing; and (e) because of those reasons, the children were at a general risk of harm. This motion was granted, and the children were removed from Cynthia's custody and placed in foster care. They have remained in DHHS custody ever since.

On October 3, 2019, Cynthia entered a plea of admission that the family home was in a condition that placed the children at a risk of harm and that the children were at a general risk of harm. Following her plea of admission, the court found that Lukah, Angel, and Xylianna were within the meaning of § 43-247(3)(a) and ordered that they remain in DHHS custody. The court also ordered Cynthia to complete a psychological evaluation, enroll in the Women's Center for Advancement, participate in supervised visitation with the children, obtain safe and stable housing, maintain a legal source of income, complete family support work, and complete a psychiatric evaluation. Over the next several months, numerous hearings were held, and Cynthia was additionally ordered to work with a family support worker, maintain contact with case professionals, undergo a chemical dependency evaluation, refrain from the ingestion of controlled substances and alcohol, submit to frequent drug testing, and participate in family therapy.

In June 2020, Cynthia moved to the Lydia House Shelter. During her residency there, she had supervised visitation with the three children. On October 15, while still living at the Lydia House, Cynthia gave birth to Dandilo. The day after his birth, the State filed a second supplemental petition alleging Dandilo was within the meaning of § 43-247(3)(a) and requested his immediate

removal to DHHS custody. Cynthia entered a denial to the petition and the court denied the State's request for his immediate removal. On November 10, after the State motioned for protective custody of Dandilo, the court ordered that Dandilo be placed in the temporary custody of DHHS but allowed him to reside with Cynthia as long as she lived at the Lydia House and abided by her safety plan.

On January 13, 2021, Cynthia tested positive for methamphetamine. Because of this positive test, she was no longer allowed to stay at the Lydia House. And as a result, the State filed an ex parte motion for immediate custody of Dandilo. The court granted this motion and Dandilo was placed in the care of DHHS. On January 22, the State filed a third supplemental petition that included allegations that Cynthia tested positive for methamphetamine and was currently homeless.

In June 2021, Cynthia began living at Family Works, a residential treatment program specialized in substance abuse and mental health treatment. At Family Works, she participated in individual therapy, medication management, domestic violence courses, and drug testing. Also, during this time, she continued supervised visitation with her children. And in October, she was ordered to have no contact with Lukah's father, Juan B.

On December 10, 2021, Cynthia gave birth to her fifth child, Kaivian. Although Kaivian is not a part of these proceedings, he was removed from Cynthia's care in August 2022. We recently upheld the juvenile court's order that continued his temporary protective custody with DHHS and excluded his placement with Cynthia. See *In re Interest of Lukah C. et al.*, No. A-23-300, 2023 WL 8590735 (Neb. App. Dec. 12, 2023) (selected for posting to court website).

On March 22, 2022, Cynthia graduated from Family Works and was able to transition into her own housing with Kaivian. During this time, she was still participating in supervised visitation with Lukah and Angel but had unsupervised visitation with Xylianna and Dandilo. However, in July, DHHS became aware that Cynthia's girlfriend, Mandy Wendland, was also residing in the home. After conducting a background check on Wendland, DHHS discovered that she had a lengthy criminal history that included over 50 arrests and a prior child abuse charge. Additionally, the background check revealed that Wendland had lost the rights to her own children and had been recently incarcerated for the destruction of Cynthia's property. After investigating this, DHHS learned that in late July, while Kaivian was present, Cynthia and Wendland had an argument that involved physical pushing. And after Wendland attempted to enter Cynthia's home by breaking a window, she was arrested.

On August 4, 2022, after discovering this information about Wendland, the State filed an amended fourth supplemental petition alleging that Cynthia engaged in domestic violence in Kaivian's presence. Kaivian was removed from Cynthia's home, and the court barred Cynthia from having Wendland around her children. Also, around this time, during her routine drug tests, Cynthia tested positive for PCP and alcohol.

After Kaivian's removal in August 2022, Cynthia continued to see Wendland, was unable maintain stable employment, and struggled to make meaningful progress toward reunification with her children. For these reasons, on March 27, 2023, the State filed a motion to terminate her parental rights for Lukah, Angel, Xylianna, and Dandilo. In this motion, the State alleged the children were within the meaning of Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and

that terminating her parental rights was in their best interests. As it related to the allegations under § 43-292(6), the State alleged that Cynthia failed to correct the following conditions:

(A) [To] not possess or ingest alcohol and/or controlled substances unless prescribed by a licensed, practicing physician;

(B) [T]o obtain and maintain safe and stable housing;

(C) [T]o obtain and maintain a stable and legal source of income;

(D) [To] participate in a rehabilitation plan to alleviate the reasons the children were removed from her care;

(E) [T]o take all medications as prescribed;

(F) [T]o sign releases of information as necessary;

(G) [T]o cooperate fully with all medication management appointments;

(H) [T]o address ongoing concerns for domestic violence in the presence of her children between she and her partners;

(I) [T]o work with a Family Support Worker;

(J) [T]o participate fully in individual therapy;

(K) [T]o have no contact with Juan [];

(L) [T]o undergo random and observed drug testing.

Cynthia entered a denial to these allegations and a termination hearing was held over 11 days from June to October 2023. On June 25, Cynthia filed a motion requesting that if her parental rights were terminated, she be allowed to continue supervised visitation with her children pending an appeal. The court took this motion under advisement.

## 2. TERMINATION HEARING

At the termination hearing, the State called 13 witnesses and Cynthia called 4, including herself.

### (a) Testimony Concerning Children

When they were removed from Cynthia's home, Lukah was 4 years old, Angel was 3 years old, and Xylianna was 6 months old. They were all originally placed in the same foster home but were eventually separated in January 2020 due to concerns regarding Lukah and Angel's sexualized behaviors. Due to their behavior, Lukah and Angel were both enrolled in Behaven Kids, a children's mental health service.

### (i) Lukah

Kelly Micek is the clinical director at Behaven Kids and works there as a therapist. She worked with Lukah from the time he enrolled in February 2020 until he was expelled in March 2023. At Behaven Kids, Lukah was diagnosed with ODD, adjustment disorder, PTSD, and ADHD and exhibited aggressive and sexualized behaviors. These behaviors included cursing at staff and trying to grab their genitalia and breasts. In multiple incidents, he stabbed a teacher's hand, bit another's hard enough to break skin, hurt another by jumping on their back, and struck a staff member so hard in the vaginal area that it caused bleeding. In addition to these actions, Lukah also

- 4 -

demonstrated numerous noncompliant behaviors. He consistently urinated in his pants, removed his clothes, ran around naked, and attacked peers by biting, kicking, and punching them.

Micek testified that Lukah was expelled from Behaven Kids in March 2023 due to his behavioral problems. She generally explained that his sexualized behaviors posed safety risks to other children in the program. This risk culminated in an incident where he touched a 4-year-old's vaginal area. Micek stated that Lukah needs a high level of supervision and time to work on the trauma he has experienced.

Allyson Hoover works for DHHS and was involved in managing Cynthia's case for several periods from August 2019 until August 2022, and still provides support at the monthly team meetings. Hoover testified that sometime in February 2022, Lukah touched Xylianna's vagina during a supervised visit with Cynthia. Xylianna was in the bathroom and requested help from Cynthia when Lukah entered and touched her. This behavior raised concerns and resulted in new rules for supervised visits where Lukah had to always be within the line-of-sight of a visit supervisor.

Danica Williams has been Lukah's foster parent since September 2021 and discussed the behavioral problems she has experienced with him. She stated that when he was first placed with her, he had multiple issues at school. He was generally noncompliant, ran out of the building, refused to complete his work, was aggressive toward peers, and swore in class. Due to these problems, in October 2021, Lukah was enrolled in Boys Town, a school that provides a higher level of care and supervision. During Lukah's time at Boys Town, Williams reported that he constantly urinated in his pants, defecated on the floor, took off his clothes, and ran around the class naked. She stated that Lukah exhibited similar behavior at home and described how he was quick to anger, threw things, and slammed doors. She also described his sexualized behaviors where he tried to grab her genitals and breasts when upset and recounted two situations where he inappropriately touched her dog's vaginal area.

Williams testified that this behavior has generally continued since Lukah began living with her. She noted that his behavior worsens after visits with Cynthia, in that, he returns with a sense of entitlement and refuses to listen. She also described how he routinely experienced anxiety before seeing Cynthia and often got into fights with Angel during visits.

Williams explained that due to Lukah's continued aggressive and sexualized behaviors he was expelled from Boys Town in February 2023. The program operators told her that he was not a good fit for the program because he was not improving and was refusing to go to class. In particular, he was still exposing himself to other students, reaching for teacher's private areas, hitting kids on their butts, and making sexualized jokes. Williams also described Lukah's other recent behaviors where he cut his finger with scissors, ran away from home, smashed his head against a car, and ripped out four of his teeth while upset.

Ashley Starostka works for DHHS and became involved with Cynthia's case in September 2022. When she first became involved in the case, she stated that Lukah was verbally aggressive, smeared his feces on walls, cussed, ran away from his foster home, punched holes in the walls, refused to go to school, and was physically aggressive with his siblings. But although Lukah was still exhibiting some of these behaviors, she said they stabilized in August 2023 after visitations with Cynthia stopped.

## (ii) Angel

Micek has worked with Angel since he was enrolled in Behaven Kids in April 2020. Micek stated that Angel was diagnosed with ADHD and ODD and demonstrated aggression toward peers and teachers. She described how he got very angry, punched peers in their private areas, touched other children inappropriately, threw things around the room, urinated in anger, and clung onto teachers. Due to these behaviors, he needed to be supervised by two staff members. Micek stated that Angel demonstrated some improvement around July 2022 after beginning therapy but had recently experienced an uptick in his behaviors. Most notably, he was crying more often, having increased emotions, running away from his classroom, and exhibiting a significant increase in aggression.

Katrina Johnson has been Angel's foster parent since June 2021 and also discussed his behavioral problems. She described his behavior at school and how he was suspended multiple times. She explained that he attacked teachers, ran out of class, jumped on desks, and was generally destructive by knocking things over and throwing things. She stated that a few teachers had to go to the hospital due to his actions. Because of his constant disruptions, she stopped taking him to school toward the end of the last school year. Johnson said that Angel was transferring schools for the next school year so he could have a more structured program.

Johnson explained that Angel is also aggressive during visitations with Cynthia. Visitation workers often informed her that Angel misbehaved during visits and refused to listen to her. And although Angel was happy after his visits with her, he told Johnson that he can do whatever he wants at Cynthia's house. Johnson was confused about Angel's behavior because he did not behave the same way with her. She reasoned that she provides the structure he needs to succeed, whereas Cynthia does not.

Starostka also testified regarding Angel's behavior. She stated that when she started working with Cynthia in September 2022, Angel was aggressive toward peers and teachers, threw things off the tables at school, injured at least one teacher, and attacked the adults that tried to control his outbursts. She stated that on one occasion the teachers had to evacuate the classroom because he was particularly uncontrollable. But Starostka believed Angel's behavior improved since living with Johnson. She stated that his behavior was drastically different with Johnson; he was polite, respectful, happy, and demonstrated age-appropriate behavior.

## (iii) Xylianna

Nicole Michalski was Xylianna's foster parent from December 2021 until June 2023, when she requested that Xylianna be moved because she posed a safety risk to the other children in her home. She explained that while Xylianna did not initially have any issues, she began exhibiting sexualized behaviors in mid-2022 that coincided with Cynthia's supervised visits.

Michalski stated that Xylianna began daycare in January 2022 and began to exhibit sexualized conduct around July. Notably, the report of Lukah touching Xylianna's vagina was made that February. Michalski explained that Xylianna's behaviors coalesced after participating in unsupervised visits with Cynthia. She described how after one visit, Xylianna urinated and defecated on the floor and wiped her feces on the walls. She also testified that around this time, Xylianna punctured a wall with a curtain rod and became generally noncompliant.

Michalski stated Xylianna's conduct became more severe around February 2023. The staff at her daycare reported that she threw fits, hit and kicked other students, threw things around the room, ran across desks, and was generally disruptive. Several incidents also occurred that worried the daycare staff. Over the course of several weeks, they found Xylianna alone in the bathroom covered in her own feces, caught her masturbating during naptime, and received reports that she was showing other students her vagina in the bathroom. Because of these escalating behaviors, in April 2023, Xylianna was not allowed back to the daycare.

Michalski similarly discussed Xylianna's behavioral issues at home. Notably, Dandilo was also placed with Michalski and continues to reside with her. She explained that around the same time Xylianna's behavior escalated at daycare, she made constant attempts to watch Michalski change and bathe Dandilo and her 5-year-old son. And on one occasion, Xylianna followed her son into the bathroom and tried to remove his pants. Michalski also described how she consistently caught Xylianna trying to sneak into the boys' bedroom late at night. This occurred so frequently, around two to six times a night, that she had to put an alarm on Xylianna's door to signal when she snuck out of her room. Michalski explained that she requested a new placement for Xylianna in June 2023 because she did not want her to become a perpetrator or for the other children to become victims.

Starostka also testified regarding Xylianna's behavior. She explained that from January 2023 to May 2023, she refused to follow directions, was hitting other children at daycare, and was exhibiting several sexualized behaviors. She expressed that Xylianna still has some concerning behaviors and believed that she regressed after visits with Cynthia. Most notably, she started drinking from a baby bottle and complained about vaginal irritation. Starostka stated that when Xylianna made these complaints, Cynthia conducted a full body inspection and administered medicine, but was concerned that Xylianna only made these complaints when around Cynthia. Starostka believed that these complaints were attention seeking behaviors and was concerned that Cynthia's appeasement contributed to Xylianna's sexualized behaviors.

(b) Testimony Concerning Cynthia

*(i) Case Managers*

Hoover and Starostka also provided substantial commentary regarding Cynthia. Hoover was Cynthia's DHHS case manager from August 2019 to December 2020, the secondary case worker from October 2021 until May 2022, and the primary case worker from June 2022 until August 2022. Once Hoover stopped being directly involved in Cynthia's case, Starostka became the child and family services supervisor for Cynthia and has worked with her ever since.

Between Hoover and Starostka's testimonies, they outlined the goals set for Cynthia and how she failed to make meaningful progress toward them. Hoover explained that Cynthia's initial goals included getting lower-level substance abuse treatment options, finding a place to live, maintaining a stable income, and implementing a routine for the children. Starostka provided more goals that included building healthy relationships, maintaining sobriety, and establishing a routine that would help her be capable of parenting five children.

To help Cynthia achieve these goals, she was offered a variety of services by DHHS. Hoover and Starostka stated that these services included inpatient and outpatient substance abuse

treatment, individual therapy, family therapy, family support, visitation services, medication management, drug testing, and domestic violence programming.

Hoover explained that when she first became involved with Cynthia's case in August 2019, her supervised visitations involved all three children. However, the visits were eventually separated due to Lukah and Angel's aggressive behaviors. These separated visits continued from June 2021 to May 2022 while Cynthia resided at Family Works. To accommodate the need for separate visits, Cynthia had supervised visits four times a week with varying combinations of her children. And 1 day a week, all her children visited her at the same time. Hoover and Starostka discussed their difficulties in rendering these visitation services because multiple agencies discharged Cynthia. The reasons for these discharges ranged from personality differences between the workers and Cynthia to frustration with Cynthia's lack of improvement.

As far as Cynthia's performance during these visits, Hoover explained that Cynthia did better during the separate visits, but still struggled with being redirected by the visit supervisors, setting boundaries, and disciplining the children. However, Cynthia did worse during the all-sibling visits. Hoover described these visits as chaotic, and said Cynthia was unable to manage the children even though there were two visitation supervisors assisting her.

During Starostka's time managing the case, she stated the visits consisted of the children punching and kicking one another, pulling each other's hair, and even attacking other children if they were outside. She testified that although Cynthia received a lot of intervention by the supervisors, she never implemented those changes and failed to make consistent improvements to her parenting. She was particularly concerned about Cynthia's failure to impose consequences during the visits because it demonstrated her inability to manage the children without assistance. Starostka explained that if Cynthia is unable to manage only a few of her children during supervised visits when there are two visitation supervisors helping her, she will be incapable of handling all five on her own. More so, she said that if Cynthia was unable to properly supervise the children, Lukah, Angel, and Xylianna's sexualized behaviors posed significant risks.

In addition to Hoover and Starostka's concerns regarding Cynthia's ability to properly supervise the children, they also had concerns regarding her ongoing relationship with Wendland. Throughout the time Starostka was involved with Cynthia's case, she had multiple discussions with her regarding Wendland. However, despite these conversations Cynthia believed that domestic violence only impacts children if they witness the incident. And although there was a January 2023 court order that barred Wendland from having contact with Cynthia's children, she continued to see Wendland and let her live in her apartment for several months in early 2023. Because of Cynthia's actions, Starostka did not believe that she comprehended the risks associated with domestic violence, particularly the risks posed to her children. This troubled Starostka because it demonstrated Cynthia's inability to form healthy relationships and overcome the problems that caused her to be involved with DHHS in the first place.

Hoover and Starostka also testified at length regarding Cynthia's minimization of Lukah, Angel, and Xylianna's sexualized behaviors. Due to Lukah's incident with Xylianna and his and Angel's behaviors, a rule was imposed that Cynthia could not bathe or change the children during visits. However, Cynthia constantly broke this rule and failed to understand the need to address the children's behaviors. Hoover described how Cynthia believed the sexualized behaviors were normal and did not understand the need for the rules. Starostka echoed this sentiment and stated

that even after having multiple conversations with Cynthia about why the rules were necessary, she failed to understand their importance. This signaled to Starostka that Cynthia was not able to properly supervise the children on her own or combat their sexualized behaviors if they were reunified. The children's behaviors also posed pragmatic problems. Due to the concerns regarding Lukah and Angel's behaviors, DHHS required that they have their own rooms to be reunified with Cynthia. And although Cynthia secured a three-bedroom apartment after graduating from Family Works in May 2022, the apartment did not have adequate space to meet those requirements.

Additionally, Starostka was concerned about Cynthia's ability to financially provide for the children because she was unable to maintain stable employment. Since her plea of admission in October 2019, Cynthia was ordered to maintain a legal income and employment, but routinely failed to do so. Although she had many jobs over the years, she only kept them for a couple days or weeks. Because of this, Cynthia was consistently unable to provide Starostka with a proof of income. While she knew that Cynthia was receiving public housing assistance and some help from local charities, without this documentation, Starostka was not aware of how Cynthia was paying for her utilities, groceries, car, and the gifts she gave the children.

Starostka also testified about her belief that Cynthia was having contact with Juan, despite the court ordering her not to. She stated that in May 2023, she saw Cynthia driving a truck that was registered to Juan. Cynthia claimed that his family lent her the vehicle, which confused Starostka because she was previously told that his family wanted nothing to do with her.

Overall, Hoover and Starostka believed that Cynthia had failed to demonstrate meaningful progress toward her goals. Hoover explained that despite receiving a multitude of services and two case managers for an extended period, Cynthia failed to understand the risks posed by domestic violence and demonstrated an inability to properly parent children, let alone children with severe aggressive and sexualized behaviors. Starostka echoed this sentiment and generally stated that despite almost 4 years of involvement with DHHS, Cynthia was unable to meaningfully engage with any of the services provided to her. Additionally, she stated that Cynthia was not able to provide a safe environment for the children because she consistently failed to acknowledge the risks of domestic violence, was unable to comprehend the severity of the children's sexualized behaviors, and demonstrated an inability to financially support herself and four children. For these reasons, Hoover and Starostka testified that they believed it was in the best interests of Lukah, Angel, Xylianna, and Dandilo to terminate Cynthia's parental rights.

*(ii) Visitation and Support Workers*

Karen Sides is a family success coach who supervised Cynthia's visits from March 2020 until December 2021. She also worked with Cynthia as a family support worker from September 2022 until May 2023. Sides noted that while she supervised Cynthia's visitations, she improved but still struggled to redirect the children and tell them no. During the time she worked as Cynthia's family support worker, she stated that Cynthia wanted to do things on her own and had difficulty accepting help and directions. At that point, Cynthia's goals were to find employment, remain sober, and work on a budget. However, Cynthia refused to work on a budget, had a hard time keeping jobs, and rejected help in finding employment. In sum, Sides thought Cynthia demonstrated improvement, but was concerned about her consistent failure to achieve goals, particularly when the children presented such serious behavioral issues.

Amy Boyer is a family support worker who worked with Cynthia for approximately 10 months beginning in February 2023. She stated that Cynthia's main goals were to learn to say no to the children, follow through on directions, and to make a routine. However, after several months of Cynthia struggling to progress on these goals, they were reduced to telling the children no and making a routine. Boyer expressed that Cynthia made minimal progress on these goals throughout her time working with her. Even with the help of multiple professionals at each visit, Cynthia struggled to redirect the children and follow the visitation rules. Although there was a rule against Lukah and Angel being alone together, Cynthia believed the boys needed to work out their disagreements themselves, so when they misbehaved, she put them alone in a bedroom. Likewise, Boyer said Cynthia constantly bathed the children and changed their clothes when she was not supposed to and did not understand why that rule was in place. Additionally, Boyer stated that Cynthia believed the boys' sexualized behaviors were normal and thought she needed more education to understand why those behaviors were concerning. Boyer expressed that Cynthia's lack of progress was in part due to her missing many sessions. Over the 10 months she worked with Cynthia, she missed around 20 appointments.

Overall, Boyer articulated that Cynthia struggled to manage her children with the help of multiple professionals and did not believe that she would be successful on her own. She stated that although Cynthia might be able to set a routine, she had little confidence she could stick to it for any meaningful period.

Barbara Robinson is the owner of a visitation service that worked with Cynthia for 6 months in 2023. She stated that she had met Lukah and Xylianna but was mostly familiar with Angel and Kaivian. She explained that when the visits were supposed to happen, Cynthia needed to confirm the visits by 8 a.m. the same day. Because Cynthia struggled with this requirement, around 10 visits were canceled in a 6-month timeframe. Robinson described how these canceled visits negatively impacted the children and caused them to become very upset.

Robinson also articulated the problems she had while working with Cynthia. She stated that when she first began supervising Cynthia's visits her house was filthy and looked like "people were getting high and just scooting stuff in corners." While Cynthia eventually cleaned up some of the mess, Robinson experienced multiple odd situations while working with her. She described that at one point another family was living with Cynthia. While dropping off the children for one visit, Robinson witnessed a family leave the house and then come back when she was about to leave. She also believed that Wendland was living with Cynthia at some point. She described an incident when she arrived to drop off the children and saw Wendland. But when Wendland noticed it was her, she took off running down the street. And on another occasion, Robinson arrived to pick up the children after a visitation and Cynthia refused to open the door for approximately 30 minutes. Robinson stated that she did not know what to do and was about to call the police when Cynthia finally opened the door. She offered no explanation for the long delay and Robinson is still unsure what happened.

Overall, Robinson explained that Cynthia does not accept responsibility for the children being in foster care, is unable to discipline the children, does not recognize her ongoing problems that prevent reunification, and is afraid of being honest with her caseworkers.

*(iii) Therapists*

Over the course of Cynthia's involvement with DHHS, she has seen multiple therapists. These therapists include Micek, Melanie Anderson, Laurie St. Patrick, and Caitlin Ann Embke.

When Micek worked with Cynthia, she was providing family therapy sessions to her, Lukah, and Angel at Behaven Kids. She indicated that during the sessions Cynthia struggled with setting boundaries. During the sessions, there were rules about not being on her cellphone, not talking about the boys' fathers, and not bringing up anything that could distract them. Micek stated that Cynthia constantly broke these rules, had a hard time telling her kids no, and did not comprehend the seriousness of their sexualized behaviors. Additionally, Micek explained that Cynthia failed to comprehend and implement the lessons she learned from the therapy sessions. She described how Cynthia struggled with taking accountability for her actions and demonstrated an inability to provide clear structure or boundaries for her children. Micek eventually discharged Cynthia from the family therapy sessions due to her lack of sustained progress.

Overall, Micek testified that she did not believe Lukah or Angel would be safe with Cynthia. She believed that Lukah's sexualized behaviors and Angel's instability posed risks to themselves and to the other children. She recommended that if Cynthia's parental rights were terminated that no further visitation occur.

Anderson is a child and family therapist at Family Works who has provided parent/child interactive therapy for Cynthia, Xylianna, and Dandilo since January 2022. Throughout her time working with them, Anderson stated that Cynthia missed many sessions and was consistently late. She stated that Cynthia's visitations were often chaotic and attributed that to Cynthia's struggle with setting limitations. Overall, she believed that Cynthia's relationships with Xylianna and Dandilo significantly improved, but admitted there was still much work for her to do.

St. Patrick was Cynthia's therapist between March 2022 and December 2022 when Cynthia was discharged for missing too many sessions. Over this period, she met with Cynthia approximately 30 times. She explained that Cynthia's primary goals were to learn how to build healthy relationships, set boundaries, work through her PTSD diagnosis, and make better decisions. Many of these goals involved her relationship with Wendland, which St. Patrick described as toxic and an impediment to her parenting abilities. Although they discussed Wendland multiple times, St. Patrick stated that Cynthia struggled to learn from these discussions. This was well illustrated by Cynthia allowing Wendland to watch Kaivian while she met with St. Patrick. St. Patrick essentially articulated that Cynthia knew about the negative effects of unhealthy relationships and understood her relationship with Wendland was unhealthy but thought she could overcome the problems by herself.

Embke was Cynthia's therapist from February 2023 to July 2023. She testified that she only saw her for approximately 12 or 13 sessions and that she was late for almost half of them. Embke stated that Cynthia struggled to find value in the sessions but knew her children needed consistency and wanted to build relationships with them. Embke did not make much progress with Cynthia because she was discharged within 6 months due to her lack of attendance.

### (iv) Cynthia's Witnesses

Once the State rested its case, Cynthia called Kelly Gassman, Sarah Valentine, and Dr. Henry Nipper. She also testified on her own behalf. Nipper's testimony is not summarized as it only pertained to why some of Cynthia's drug tests resulted in presumptive positives.

Gassman is a physician assistant that started seeing Cynthia in November 2022. She stated that Cynthia was diagnosed with an unspecified mood disorder, PTSD, cannabis use disorder in remission, methamphetamine use disorder in remission, and ADHD. Gassman prescribed Cynthia multiple drugs in relation to these diagnoses. She stated that in the last several months Cynthia expressed difficulty sleeping and waking up, so they changed one of her drugs that had sedation as a side effect. This was relevant because several of the State's witnesses commented on Cynthia's inability to wake up at a reasonable time and maintain a schedule.

Valentine works for the drug testing company that conducted Cynthia's drug tests in March and April 2021 and from August 2022 until the time of the hearing. She testified that during the later period Cynthia was being tested two times per week and was observed during the process. Valentine articulated that Cynthia had missed 19 drug tests since 2021 and tested presumptive positive for PCP and positive for alcohol in August 2022. She also tested presumptive positive for PCP twice in October. Additionally, she tested presumptive positive for amphetamines in November 2022, hydrocodone in December 2022, and opiates or morphine in July 2023. However, except for the positive alcohol result and the PCP presumptive positives, Cynthia was able to provide prescriptions to explain the results. Valentine stated that based on Cynthia's drug test results, she did not believe Cynthia was currently using illicit substances.

Cynthia also testified, but the scope of her testimony was severely limited. She discussed how she was taking community college courses and using student loans to pay her bills. These monthly bills included $500 for her electric, gas, and cell phone, and $700 for a car payment. She stated that she did not have to pay the loans back until May 2024.

### 3. Juvenile Court's Order

On January 17, 2024, the court terminated Cynthia's parental rights to Lukah, Angel, Xylianna, and Dandilo. It found that the State proved by clear and convincing evidence that statutory bases for termination existed under § 43-292(2), (6), and (7). As it applies to the basis under § 43-292(6), the court found that Cynthia failed to participate in her rehabilitation plan, address concerns of domestic violence, engage in individual therapy, and have no contact with Juan. Further, the court found that it was in the children's best interests to sever Cynthia's parental rights. Lastly, the court denied Cynthia's request to continue supervised visitation while her appeal was pending and stated that a final goodbye could occur if recommended by the children's therapists. Cynthia now appeals.

### III. ASSIGNMENTS OF ERROR

Restated, Cynthia assigns the juvenile court erred in finding that Lukah, Angel, Xylianna, and Dandilo came within the meaning of § 43-292(2), (6), and (7); that Cynthia was unfit to parent them; and that it was in their best interests to terminate her parental rights.

She also assigns that the court erred by denying her motion to continue supervised visitations pending her appeal and by improperly delegating the decision regarding a final goodbye visit to the children's therapists.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.*

## V. ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Gabriel B., supra.* The State must prove these facts by clear and convincing evidence. *Id.*

### 1. STATUTORY BASIS

Cynthia first assigns the juvenile court erred in finding that a statutory basis was met to terminate her parental rights under § 43-292. The State sought termination of Cynthia's parental rights pursuant to § 43-292(2), (6), and (7). The juvenile court found the State proved each of these by clear and convincing evidence.

Cynthia concedes that § 43-292(7) has been satisfied, and we agree. Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. This subsection operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra.* The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023).

Lukah, Angel, and Xylianna were removed from Cynthia's home and placed in the custody of DHHS in August 2019. And Dandilo was removed from Cynthia's care and placed in DHHS custody in January 2021. Each child has remained in DHHS custody since their removal. Therefore, at the time the motion to terminate Cynthia's parental rights was filed on March 27, 2023, Lukah, Angel, and Xylianna had been in an out-of-home placement for approximately 43 months and Dandilo had been in an out-of-home placement for approximately 26 months. Therefore, the State presented sufficient evidence to satisfy § 43-292(7).

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Mateo L. et al., supra.* Because we find that the State

- 13 -

presented clear and convincing evidence that a statutory ground to terminate existed under § 43-292(7), we need not address the other statutory grounds.

## 2. BEST INTERESTS

Cynthia next assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that it was in the children's best interests to terminate her parental rights.

Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Upon our de novo review, we conclude that the State proved by clear and convincing evidence that the termination of Cynthia's parental rights was in the best interests of Lukah, Angel, Xylianna, and Dandilo. Specifically, we determine that Cynthia has demonstrated an inability to incorporate the necessary changes to properly parent her children, three of whom exhibit severe behavioral issues, failed to remedy her and the children's risk of domestic violence, and displayed an inability to financially support herself and four children.

Despite receiving a myriad of services for nearly 4 years, Cynthia still struggles with the same issues that led to her involvement with DHHS. Although there were periods where she displayed improvement, this improvement was not consistent or long lasting. She continues to receive the same feedback from therapists, visitation workers, family support staff, and case managers. And although she has received the maximum possible assistance from DHHS, she still struggles with the basic skills required to parent four children. The record shows that Cynthia is unable to establish and maintain a routine, adequately care for her children, make a budget, and form healthy relationships.

Multiple witnesses testified that Cynthia consistently missed visitations, therapy sessions, and drug tests. These absences disrupted these services and led to numerous visitation agencies and therapists discharging her. But even when she participated in the visitations, and had the assistance of two visitations workers, she struggled to properly parent her children. At these visits, her discipline was inconsistent, she struggled with telling the children no, refused redirections, and minimized severe behavioral problems. Multiple witnesses described her visitations as chaotic and discussed how the children's behaviors regressed after seeing her.

- 14 -

With Cynthia struggling to properly care for her children while having the help of multiple professionals, we have no confidence that she will improve on her own. Lukah, Angel, and Xylianna require higher levels of supervision than other children. They display concerning aggressive and sexualized behaviors that Cynthia has been incapable of understanding or mitigating. Lukah, Angel, and Xylianna require medication, therapy, and specialized services to help with their diagnoses and behaviors. With Cynthia constantly missing her own therapy sessions, visitations, and drug tests, we have no confidence that she will be able to ensure her children receive the medical assistance they require. And without that medical assistance, the children pose risks to themselves and to others. But even if Cynthia was able to ensure her children attended their appointments and received the care they need, we still lack confidence that she can ensure their safety. Throughout the pendency of this case, Cynthia minimized the children's behaviors and failed to comprehend their severity. This incomprehension displays an incapability to provide the necessary support, structure, and care her children require.

Cynthia's incomprehension is well illustrated by her refusal to follow visitation rules. Despite being told numerous times why she was not allowed to bathe or change the children during visits, she continued to do so. Similarly, she was told to not allow Lukah and Angel to be alone together but placed them alone in a bedroom. Beyond the callousness of repeatedly violating these rules, her actions exhibit an inability to recognize the need for the rules and the risks posed by violating them.

Additionally, Cynthia's continued involvement with Wendland demonstrates a disregard for her and her children's safety. Although Cynthia completed multiple courses concerning domestic violence and discussed the dangers it poses with multiple professionals, she fails to comprehend how domestic violence, even when not witnessed by the children, puts them in danger. She not only maintains contact with Wendland but allowed her to supervise Kaivian during her therapy sessions and live with her for a period in early 2023. Cynthia's refusal to acknowledge the risks posed by this relationship is concerning and presents obvious risks to herself and to her children, which she continues to ignore.

Finally, Cynthia has not shown an ability to financially support herself, let alone four children. While she was employed at various points throughout the pendency of this case, she was unable to keep those jobs for any meaningful period. She now relies on public assistance, charity, and student loans to pay her bills. While Cynthia's history of unemployment and reliance on others to pay her bills, alone, may not warrant termination of her parental rights, in conjunction with her other deficiencies, it illustrates a further inability to establish a routine and take the required steps to provide the necessary care for her children.

With Cynthia's numerous deficiencies, we determine that she is unfit to parent Lukah, Angel, Xylianna, and Dandilo. Despite receiving substantial and continuous services from DHHS for almost four years, Cynthia has not made any meaningful improvements in her parenting, minimizes her children's concerning behaviors, cannot maintain a structure or routine, continues her unhealthy relationship with Wendland, and struggles to financially support herself. We determine that these problems have prevented or will probably prevent her from performing the reasonable parental obligations necessary in child rearing or will probably result in detriment to the children's well-being. Therefore, we determine the district court did not err in terminating Cynthia's parental rights to Lukah, Angel, Xylianna, and Dandilo.

### 3. CONTINUED VISITATION

Cynthia next assigns the juvenile court erred by denying her motion for continued visitation pending appeal and by delegating whether the final goodbye visit should occur to the children's therapists.

A trial court has a nondelegable duty to determine questions of custody and parenting time of minor children according to their best interests. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019). The authority to determine custody and visitation cannot be delegated because it is a judicial function. *State on behalf of Ryley G. v. Ryan G.*, 306 Neb. 63, 943 N.W.2d 709 (2020).

In *Deacon v. Deacon*, 207 Neb. 193, 297 N.W.2d 757 (1980), *disapproved on other grounds, Gibilisco v. Gibilisco*, 263 Neb. 27, 637 N.W.2d 898 (2002), the Nebraska Supreme Court reversed an order which granted a psychologist the authority to effectively determine visitation and to control the extent and time of such visitation. The court concluded that such an order was "not the intent of the law and is an unlawful delegation of the trial court's duty." *Deacon v. Deacon*, 207 Neb. at 200, 297 N.W.2d at 762. This ruling has since been upheld on numerous occasions. See *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995) (county court, sitting as juvenile court, found to have improperly delegated its authority to determine parental visitation rights to a psychiatrist); *Mark J. v. Darla B.*, 21 Neb. App. 770, 842 N.W.2d 832 (2014); *Barth v. Barth*, 22 Neb. App. 241, 851 N.W.2d 104 (2014).

In the present case, the relevant portion of the juvenile court's order stated: "It is further ordered that the Motion for Continued Visitation is hereby denied. Visits between the mother . . . and the minor children, [Lukah], [Angel], [Xylianna], and [Dandilo], shall cease immediately with the exception of a final goodbye visit being scheduled if recommended by the therapist for each child."

We determine the court did not err in denying the motion for continued visitation based on the children's best interests but erred in delegating whether a final visit should occur to the children's therapists. For the same reasons articulated in the prior section concerning the children's best interests, we determine that the children's best interests were served by discontinuing visitations with Cynthia pending her appeal. However, the court improperly delegated its judicial authority by delegating whether a final goodbye visit would occur to the children's therapists. That improper delegation of authority constitutes reversible error. See *In re Interest of Teela H., supra.* Accordingly, we reverse that portion of the court's order and remand the matter with directions to determine whether a final goodbye visit should occur.

## VI. CONCLUSION

We conclude that there was a statutory basis under § 43-292(7) to terminate Cynthia's parental rights to Lukah, Angel, Xylianna, and Dandilo and that terminating her parental rights were in their best interests. We also determine that the juvenile court did not err in denying Cynthia's motion for continued visitation pending her appeal but committed reversible error by delegating its judicial authority to determine whether a final goodbye visit should occur to the

children's therapists. Therefore, we reverse the court's improper delegation of authority and remand the issue with directions to decide whether a final goodbye visit should occur.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.
